## NATIONAL LABOR RELATIONS BOARD v. GOOD COAL CO.

No. 8349.

Circuit Court of Appeals, Sixth Circuit.

March 8, 1940.

Writ of Certiorari Denied May 6, 1940.

See 60 S.Ct. 978, 84 L.Ed. ——.

Philip G. Phillips, of Cincinnati, Ohio (Charles Fahy, Robert B. Watts, Laurence A. Knapp, Bertram Edises, and Richard C. Barrett, all of Washington, D. C., on the brief), for petitioner.

Cleon K. Calvert, of Pineville, Ky. (Cleon K. Calvert, of Pineville, Ky., and Greene & Hannah, of Harlan, Ky., on the brief), for respondent.

Before HICKS, HAMILTON, and ARANT, Circuit Judges.

HICKS, Circuit Judge.

Petition of the National Labor Relations Board for enforcement of its order issued under Sec. 10(c) of the National Labor Relations Act, 29 U.S.C. § 160(c), 29 U.S.C.A. § 160(c).

The order required that respondent, Good Coal Company, a Kentucky corporation, operating a coal mine at Lisle, Harlan County, Ky., cease and desist from discouraging membership in, and refusing to bargain with the United Mine Workers of America, District 19 (herein called the Union); from recognizing the Wallins Creek Employees Association, an intervenor (herein called Association), as repre-

sentatives of its employees and from dominating or interfering with its administration or any other labor organization of its employees; and from in any manner interfering with or coercing its employees in the exercise of their rights to self-organization for the purposes of collective bargaining under Sec. 7 of the Act, 29 U.S.C.A. § 157.

Respondent, its officers, agents, etc., were required, affirmatively, to refrain from recognition of the Association and to dis-establish it as a representative of any of its employees for purposes of dealing with respondent; to make whole the persons named in Appendix B to the order and to make whole John Wenzer, Stonewall Jackson, Roy Sturgill and Roscoe Jones for any loss of pay ensuing from respondent's discriminatory refusal to employ them on September 7, 1937, and to offer all said persons reinstatement and to offer reinstatement also to Jim Scott, Charles Slagle, Morris Slagle, Emmett Slagle, Burley Stevens, George Slusher, Roosevelt Slusher, John Wynn and Curtis Simpson, who shortly after September 7, 1937, ceased work because of respondent's refusal of employment to the above specified persons; to make whole these nine men for any loss sustained for the period between their application for reinstatement and the date of reinstatement; upon request to bargain collectively with U. M. W. A., District 19, as the exclusive representative of the production employees of respondent in respect to grievances, pay, hours, etc.; to post notices that it will cease and desist as directed and take the required affirmative action; and to notify the Regional Director, within twenty days of the order, of the steps taken to comply therewith.

A preliminary question, contested by respondent, is, whether its business in relation to interstate commerce is subject to the Act.

Respondent had under lease 1,500 to 2,000 acres of coal land which it operated on a royalty basis. It conducted a commissary and maintained approximately 113 houses which it rented to its employees. Its yearly production was about 160,000 tons. It delivered the coal from its tipples to the cars of the L. & N. Railroad Company and the bulk of it went into interstate commerce. Eighty-five per cent was sold to three companies, one with offices in Knoxville, Tenn., and two others with offices in Cincinnati, Ohio, and was shipped into ten different states. Shipping instructions were received by mail or telephone from beyond the state. The coal destined for beyond the state was sold f. o. b. the tipple and when it was loaded into the railroad cars, title passed to the purchasers by whom it was shipped to destination at their own risk and expense. If respondent prepaid the freight it was immediately reimbursed. Respondent employed around 180 men in production. It bought large quantities of sand and powder necessary for its operation from points beyond the state.

The factual situation is substantially like that in Clover Fork Coal Co. v. National L. R. B., 6 Cir., 97 F.2d 331, and we think, upon the authority of that case, that the jurisdiction of the Board to issue the order complained of is beyond question. See also National Labor Relations Board v. Kentucky Fire Brick Co., 6 Cir., 99 F.2d 89, 91, and cases there cited.

The charge filed by the Union with the Board which precipitated the complaint against respondent was, that J. L. McIntyre, General Manager, refused to permit between 100 and 130 miners to return to work on Tuesday September 7, 1937, or thereafter, for the announced reason that they had failed to report for work on Labor Day, Monday, September 6.

McIntyre and Greene, President of respondent, testified that the mine had a rule that if a man laid off without permission he was automatically discharged and that the sole reason for discharging the men was that they had not worked on Labor Day. Greene testified that he had returned to the mine on Friday from a sales trip with orders for coal and that it was necessary to work on Labor Day; that it was his understanding that most everybody worked on Labor Day in the Harlan field. McIntyre testified that he posted a work notice on Saturday before Labor Day and blew the whistle on Sunday which indicated that there would be work on Monday, Labor Day, but he admitted that on Friday evening he had heard that the men were talking of laying off on Labor Day.

Jackson, a mine foreman, testified that he asked McIntyre "if he was going to work on Monday and he said 'Hell, yes, why?' I told him there was a rumor, talking among the men they wasn't going to work, they was going to attend the big union

blow-out. He said he was going to work if there wasn't but three men and he will put up a notice we would work tomorrow."

Only about 40 men worked on Labor Day. The great majority attended a union rally at Black Mountain. On Sunday, the previous day, the Local at Lisle (U. M. W. A. No. 1255) had met and voted unanimously not to work on Monday. A committee was appointed to so notify McIntyre but did not do so because it was informed that he had already heard of the meeting and had said that he was going to run the mine anyway "if there wasn't but three out and he had to run a motor himself."

When it appeared that the majority of the men were not working on Labor Day, McIntyre posted the following notice at the mine:

"Sept. 6, 1937—about 9:30 A.M.
"Notice to all Employees Who Did Not Report for Work, Monday Sept. 6, 1937, will please consider themselves discharged and report to office for settlement.
"J. L. McIntyre, General Manager."

On Tuesday morning most of the men, about 200, reported for work and were met by McIntyre and three deputy sheriffs. Jackson testified that McIntyre told the assembled miners "that all the men that didn't work the day before was fired."

One hundred and two of the men who were refused reinstatement on Tuesday were members of the Union and had absented themselves from work pursuant to the resolution to observe Labor Day. Four other Union members who had been absent on account of illness or for other reasons were also denied reinstatement. Proceedings to eject the discharged miners from the houses were instituted the same day. Jackson testified that he reported to McIntyre about some men being off sick and about two men that he, Jackson, had laid off. McIntyre said: " * * * don't mete out anything. * * * We will put them on the run. If they was in our place, they would put us on the run."

Jackson testified that he never knew of an instance where McIntyre had discharged a man for laying off a day except on one occasion seven or eight years before at a different mine when there was a labor shortage. The miners who testified on this point emphatically denied that there been any such rule.

Notwithstanding respondent's claim that the sole reason for the discharge of the men was that they had failed to work on Labor Day, the Board concluded that the purported discharge resulted from a labor dispute and that in consequence these miners retained their status as employees for the protective purposes of the Act. This finding was undoubtedly correct. Monday, September 6, 1937, was a legal public holiday celebrated and known as "Labor's Holiday" (Title 5, Ch. 1, Sec. 87 U.S. C., 5 U.S.C.A. § 87) and the question whether the miners should work on that day clearly involved a controversy concerning the terms, tenure or conditions of employment [Sec. 2(9) of the Act, 29 U.S.C.A. § 152(9)].

The dispute was current and notwithstanding the attempt to discharge them, the miners who failed to work on that day remained employees [Sec. 2(3)] and were protected against the unfair labor practices denounced by the Act. National Labor Board v. Mackay Co., 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381.

As to unfair labor practices, the Board found, (1) that respondent had dominated and interfered with the formation and administration of the Association and contributed support to it in violation of Sec. 8(2) and (1) of the Act, 29 U.S.C.A. § 158(2), and (1), and had thereby interfered with the rights of its employees guaranteed them by Sec. 7 of the Act; and (2) that respondent had refused to bargain collectively with the Union which represented a majority of employees in an appropriate unit in violation of Sec. 8(5) and (1) of the Act; that respondent on Sept. 7, 1937, had discharged and refused to reinstate 106 named employees because they had engaged in union activities in violation of Sec. 8(3) and Sec. 1; and (3) that respondent, in violation of Sec. 8(1) of the Act had in various ways interfered with, restrained and coerced its employees in the exercise of the rights guaranteed to them in Sec. 7 of the Act.

"The findings of the Board as to the facts, if supported by evidence, shall be conclusive." National Labor Relations Act, 29 U.S.C. § 160(e), 29 U.S.C.A. § 160(e).

See also the full comment upon this provision in National Labor Relations Board v. Waterman S. S. Corp., 60 S.Ct. 493, 84 L.Ed. —, decided February 12, 1940.

When, early in 1937, it became apparent that an attempt would be made to unionize respondent's mines, McIntyre called a meeting at the schoolhouse, ostensibly to consider Red Cross and burial funds. In the course of the meeting McIntyre spoke to the men. He said: " * * * there seemed to be quite a bit of newspaper and press about organizing the coal fields, and especially Harlan County, and that I didn't want them to sneak around behind my back and organize. When the time come and Harlan County was going to be organized, I would see to it they was properly organized in any way, shape and form and get some good representatives out of their lines, and we would go along in a peaceful way."

Herman Jones, who became a member of the mine committee after the Local was organized in May, testified that McIntyre said in that speech,—"He didn't want no such damn Union as they had at Black Mountain, all the time causing trouble."

Jackson testified that McIntyre "told them to lay off and when it come before them that they needed an organization that he would help them to get organized and get them a charter and pick their committees, help to pick the committees."

This speech indicates the attitude of the respondent toward the Union prior to the wholesale discharge on September 7. It was followed by the circulation of a petition, signed by most of the miners, and admittedly drawn by McIntyre, stating that the undersigned had " * * * elected to deal collectively with our company * * * do not wish to be intimidated with, or from outside sources, which had been prevalent for the past few weeks. * * *"

One miner, Stines, testified that before the McIntyre speech he received a "house notice" and asked McIntyre "What I have done to get a house notice?" and received the answer, "They tell me you belong to the United Mine Workers, and if you do, the notice is good. Vacate the property." When Stines informed him that he did not belong, McIntyre said,—"I have got a way of checking up and finding out. If you do, the notice stands good, but if you don't ignore the notice and go on back to work." George Stines had a similar experience.

The local Union was chartered on May 17, 1937. Elijah Helton, an officer, testified that there were 67 charter members. On June 15 there were 151 members. Hunt, recording secretary, testified that on August 6 there were approximately 170 members. Reynolds, financial secretary, estimated that on Labor Day there were 160 "ordinary members." He had a total of 186 names on his books but testified that some 20 or 25 men had left and that he had no authority to strike their names from the books.

After the local Union was chartered, its mine committee undertook to take up certain matters with McIntyre. On all matters involving acknowledgment of the existence of the Union, this committee was met with hostility. Hunter testified as follows: "On the 29th of May we approached Mr. McIntyre. * * * We asked him if we could get the schoolhouse to meet in. * * * He said 'Who is "we"? How many does that represent?' We told him one hundred and sixty-five members of the United Mine Workers of America. He said, 'Well, I think you boys got in a hell of a damn hurry. * * * I told you up there in the meeting at the schoolhouse that when the proper time comes, that I would help you select your committee, go with you and help you to get your charter. * * * You can look at this Black Mountain union up here,' meaning the United Mine Workers of America. * * * 'They are all the time raising hell * * * I don't want no such organization as that in our camp. * * * We only have a few thousand dollars in our company, and before I will recognize the United Mine Workers, I will drag my steel, sell my machinery, and sell it for what little we have in it, and close the drift mouth and quit. * * * Well, you fellows can go back and report that you cannot have the schoolhouse.'"

Herman Jones, the committeeman hereinbefore mentioned, testified touching a meeting with McIntyre on August 5, when the Union membership was between 140 and 170. The committee "Asked him if he was willing to take our check-off slips and take our majority or still swear to our Labor Board count. * * * He said 'To hell with the Labor Board count. They couldn't have a damn union * * * go back and tell them fellows, he wasn't going to have a damn thing to do with * * * the United Mine Workers. That

if they wanted a strick (sic) to go ahead and strike, he had broke it in twenty-four hours and he could do it again."

McIntyre admitted that he denied the committee the use of the schoolhouse and with reference to the testimony of the miners about the August 5 meeting over the check-off slips, he said,—"I guess they swore what I told them * * * I haven't disputed it." He amplified by stating that he told the committee he would not recognize the United Mine Workers under any circumstances.

With reference to a request for a Labor Board vote, he said: "I told them the Labor Board could hold a meeting when I would agree to it. * * *"

Laying to one side for the moment the matter of respondent's domination and support of the Association, we think the remaining findings of the Board are supported by substantial evidence and must be sustained. It is true that McIntyre testified that he didn't care how many of his men were Union members and there was some evidence that after the Labor Day incident a number of Union men were continued in employment but it is clear enough that every time overtures were made to McIntyre to deal collectively with the local Union he either ignored its existence or refused pointblank to deal with its representatives or to acquiesce in an election to determine if the Union had a majority. The Labor Day meeting furnished McIntyre with the opportunity to invoke a non-existent rule, for the purpose of weeding out Union members at one swoop. This was overt discrimination.

On the question whether respondent dominated and gave encouragement to the Association as the representative of its employees for purposes of dealing with it, the evidence is not so clear. Respondent's representatives met almost every statement that it had aided in the formation of and had encouraged the Association with a categorical denial. And yet there is substantial evidence to support the findings on this feature.

In his February, 1937, speech, McIntyre had suggested an organization of the miners which he would direct and assist. An unaffiliated union of miners had been organized at "Totz," a neighboring mine and one Cecil Barnes, a member of it, testified that he spoke to McIntyre about its advantages and that McIntyre replied, "What I have been trying to get the coal operators' association of Harlan County to do for five or six years." That McIntyre further said that he "would see the men and get them to work on it," but that he himself must remain in the background so that it would not appear that respondent had participated in the formation of such an organization. Following this conversation McIntyre gave Barnes a job at respondent's mine. The Association was organized about August 6, 1937, and there is evidence carrying a substantial inference that McIntyre assisted in procuring its charter. It held meetings, adopted by-laws, elected officers and appointed committees. Jackson testified that about the 20th of August he and George Clontz, another foreman of respondent, were handed a list of men by McIntyre with the statement that they were Company union men and should be favored. Clontz and McIntyre both denied this incident.

Jackson further testified that McIntyre directed him to shift Allred, a member of the Union, to a less desirable place and replace him with Price, a member of the Association, in order that Price might "exercise influence over the men." McIntyre also denied this incident but his denials are not controlling where the crucial question is whether the fact findings of the Board are supported by evidence.

We think the evidence gives substantial support to the Board's findings that respondent had interfered with the right of its employees to sole recognition, through the medium of the Association. See National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L. R. 307. A decree will be entered for the enforcement of the order of the Board.