**NATIONAL LABOR RELATIONS
BOARD**

v.

**UNITED BISCUIT CO. OF AMERICA,
UNION BISCUIT DIVISION.**

**No. 14829.**

United States Court of Appeals
Eighth Circuit.

Nov. 19, 1953.

Rehearing Denied Dec. 10, 1953.

Bernard Dunau, Attorney, National Labor Relations Board, Washington, D. C. (George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Asst. Gen. Counsel, Washington, D. C., and H. T. Herrick, Attorney, National Labor Relations Board, on the brief), for petitioner.

Harold A. Thomas, Jr., St. Louis, Mo. (N. W. Hartman, and Fordyce, Mayne, Hartman, Renard & Stribling, St. Louis, Mo., on the brief), for respondent.

Before GARDNER, Chief Judge, and WOODROUGH and COLLET, Circuit Judges.

GARDNER, Chief Judge.

The National Labor Relations Board has petitioned for the enforcement of an order issued by it against the United Biscuit Company of America, Union Biscuit Division, requiring it to cease and desist from engaging in certain acts found by the Board to be violative of section 8(a) (1) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (1). On August 9, 1951, Local 611, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, A. F. L., filed with the Board a charge of unfair labor practices against

respondent based upon which the Board issued its complaint charging that respondent had engaged and was engaging in unfair labor practices within the meaning of the National Labor Relations Act. In the complaint as amplified by a bill of particulars it was charged in substance that respondent was guilty of: (1) Threatening that those who joined the Union would not be promoted to supervisory positions. (2) Threatening to close the plant to discourage the employees from engaging in concerted activities. (3) Interrogating employees, and (4) soliciting withdrawals from the Union. At the time of hearing before the Examiner the Union which had filed the charges moved to dismiss the complaint based thereon. This motion was denied and on hearing the Examiner exonerated the respondent of the charge of threatening that those who joined the Union would not be promoted to supervisory positions and of the charge of threatening to close the plant to discourage the employees from engaging in concerted activities, but found against respondent on the other two charges. Respondent filed exceptions to the Examiner's report which the Board overruled and thereupon adopted and approved the report and issued the cease and desist order which it now seeks to have enforced.

Respondent resists the petition for enforcement of this cease and desist order on the ground that the findings of the Board are not sustained by substantial evidence.

Respondent is engaged in the manufacture, sale and distribution of bakery products and has a branch or division in the city of St. Louis, Missouri. At its plant in St. Louis it employs about 500 employees. These employees may be classified as about 355 shipping and production employees, 12 drivers and 20 route salesmen. All the employees, save the route salesmen, are represented by two different local unions. In July, 1951, a campaign was initiated to organize the route salesmen and certain of the salesmen communicated with Mr. Charles E. Kennedy, the president and officer in charge of the company's business at St. Louis, advising him that they had been approached by organizers for the Union and asking his advice. Following this incident, at a regular weekly meeting of the route salesmen Mr. Kennedy made a talk in which he stated to the men that he was aware of the federal laws and that while he had no right to threaten, intimidate or coerce them, or make them any promises, he did have a right to talk to them just as the Union did; that he wanted it clearly understood that they could join a union or not, whatever they wanted to do. He did not ask anyone whether they had stated anything or signed anything. In response to questions from some of the men Kennedy delivered a talk comparing respondent's position on wages and their working conditions to the situation in competing plants. He warned the employees not to rely too heavily on the Union's promises of better pay or working conditions, that respondent would " * * * have a voice in this thing. * * * We are not just going to turn it over to 611 or to any other union. * * * The company still reserves the right to manage the business." He added, "There might be some shutdowns. * * * I am not threatening in this * * * but there might be because we couldn't get together with the Union on some understanding." After this meeting certain of the men approached Mr. Kennedy and asked to speak with him about the subjects discussed in the meeting. He advised them that he was tired but said he would meet with them the following week. Accordingly on the following week, Kennedy's secretary asked these and the other route salesmen to come in and meet with him individually at their convenience and between 12 and 15 of the route salesmen did come in separately to meet with Kennedy at which time the subject of the Union campaign was discussed and subsequently two of these men sent letters of withdrawal to the Union.

Three of the employees who had met with Mr. Kennedy were produced as wit-

nesses by General Counsel for the Board and they as well as Mr. Kennedy testified as to what occurred at these meetings. In fact there was no other testimony except that given by these four witnesses. Each of the 12 or 15 employees who had been asked to report at Mr. Kennedy's office appeared separately and was interviewed by Mr. Kennedy. Two of them had signed requests authorizing the Union to represent them as collective bargaining agent. They told Mr. Kennedy that they did not now desire to join the Union nor to be represented by any union and in response to inquiries by these employees Mr. Kennedy suggested that they send a letter to the Union withdrawing or asking to cancel their request that the union represent them as their collective bargaining agent. Mr. Kennedy assisted them in wording the letters and the letters were delivered to Mr. Kennedy's secretary with postage for mailing. The interviews with other employees had a somewhat different pattern as the others had not signed a request authorizing the Union to represent them as bargaining agent. Kennedy asked each summoned employee in effect what his attitude was with reference to unionizing the route salesmen and was advised they were opposed to such movement and he then asked them to give him a signed statement in writing. He had prior to these conferences prepared a form of statement which he exhibited to each employee with a view of assisting him in formulating a letter declaring his attitude toward unionizing his class of employees. Each employee wrote out a statement in his own handwriting, signed it and delivered it to Mr. Kennedy. These statements he retained for some considerable time but finally, according to his testimony, he destroyed them together with the statement he prepared in advance of the conferences and which he exhibited to the employees for assistance in wording their statements. In answer to interrogatories as to what purpose he had in mind in taking these statements he said, "Because I thought I might be called down here and I wanted to have something on my side." In answer to inquiry as to why he had destroyed the statements he said, "I felt afterwards and after studying it over that maybe that I shouldn't even have them." He was interrogated as to the use made by the employees of the form of statement prepared by him. He testified that he did not permit the employees to study the statement but took it back from them because, "I felt I was within my rights in showing it to them and I didn't want to be incriminated by letting them have it to digest and so forth."

■ In this proceeding we are not called upon to weigh the evidence but only to examine it for the purpose of determining whether or not on the entire record the essential findings are sustained by substantial evidence and in performing this function we must view the evidence in a light most favorable to the prevailing party. In Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 465, 95 L.Ed. 456, we are admonished by the Supreme Court that in this area of mixed fact and law, a court will not lightly disregard the overall appraisal of the situation by the Labor Board "as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect."

Mr. Kennedy who was the president and apparently the active manager of respondent made it very clear in his talk to the route salesmen that he was not favorable to unionizing their group. He advised them that they could join or not join the Union as they pleased and he made no threat of reprisal should they do so. There is now no doubt that the right of free speech as protected by the Constitution is not limited to any class and the right may be exercised by the employer as well as the employee. Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093; N. L. R. B. v. J. L. Brandeis & Sons, 8 Cir., 145 F.2d 556;

N. L. R. B. v. Montgomery Ward & Co., Inc., 8 Cir., 157 F.2d 486.

The week following the meeting above referred to each of the 12 or 15 employees was separately interviewed with reference to the proposed unionization of this group of employees. Each knew that Kennedy was opposed to unionization and when he learned the interviewed employee was opposed to the Union he did not there stop but requested each employee so interviewed to sign a written declaration specifically declaring that he was opposed to the Union or the authorization of the Union to represent him as his bargaining agent. These signed statements were delivered to Mr. Kennedy. The purpose for which they were so secured was, we think, a question to be determined by the Board from all the facts and surrounding circumstances. There was then pending a representation petition which in due time was to be voted upon by these very employees. The Board might, we think, well have concluded that the securing of these written statements by the president of the company was intended as a deterrent to their freedom of action. In a sense this statement was held over them in the nature of a threat. In Texarkana Bus Co. v. N. L. R. B., 8 Cir., 119 F.2d 480, 483, the officers of the employer prepared letters on company stationery reading as follows:

"Mr. J. D. Elliott or To whom it may concern:
"Gentlemen: The purpose of this letter is to advise you that I do not wish for you or anyone else to bargain for or make any kind of a contract for me or in my behalf with the Texarkana Bus Company, Inc.
"Yours truly".

They then invited practically all the drivers to the company office and requested them to sign the letter which with two exceptions they did. The J. D. Elliott addressed was the organizer for the union. Concerning this action on behalf of the employer we among other things said:

"The Board was warranted in believing that this was a manifest attempt to influence the employees in a matter of labor organization and to forestall, if possible, the selection of a representative to bargain collectively for the employees."

So here we conclude that the Board was warranted in finding that the taking of these written statements was under the circumstances an attempt to influence by intimidation the employees in a matter of labor organization.

It is finally urged that enforcement of the order to cease and desist should be withheld because of the lapse of time since the alleged unfair labor practice occurred and because there has been no repetition of the questioned practice. There has apparently been no occasion for any repetition, but it is respondent's contention that it has a right to do so if occasion should arise. The mere lapse of time is not attributable to the fault of the Board nor of any official charged with any duty in connection with the administration of the law and furnishes, we think, no logical basis for denying enforcement of the order. N. L. R. B. v. Mexia Textile Mills, Inc., 339 U.S. 563, 70 S.Ct. 826, 833, 94 L.Ed. 1067; N. L. R. B. v. Pool Manufacturing Co., 339 U.S. 577, 70 S.Ct. 830, 94 L.Ed. 1077. A somewhat similar contention was urged in N. L. R. B. v. Mexia Textile Mills, Inc., supra, and in the course of the opinion in that case the court said [339 U.S. 563, 70 S.Ct. 829]:

"A Board order imposes a continuing obligation; and the Board is entitled to have the resumption of the unfair practice barred by an enforcement decree."

The cease and desist order will therefore be enforced by an appropriate decree.