### NATIONAL LABOR RELATIONS BOARD

v.

### SUN CO. OF SAN BERNARDINO, CALIFORNIA.

#### No. 14008.

United States Court of Appeals, Ninth Circuit.

Aug. 27, 1954.

Rehearing Denied Sept. 27, 1954.

George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Samuel M. Singer, Bernard Dunau, William J. Avrutis, Attys., N. L. R. B., Washington, D. C., for petitioner.

John B. Lonergan, San Bernardino, Cal., for respondent.

Before DENMAN, Chief Judge, and BONE and ORR, Circuit Judges.

ORR, Circuit Judge.

The Board found violations of § 8(a) (1) and § 8(a) (3) of the National Labor Relations Act, 29 U.S.C.A. § 158(a), (1, 3), to have been committed by respondent company. It entered certain orders.

In considering the request of the Board to enforce its orders we are confronted with the task, usually present in N. L. R. B. enforcement cases, of determining whether the record discloses substantial evidence to support the Board's findings. Preliminarily it may be stated that we have found it helpful in evaluating the evidence to keep in mind that the labor record of the respondent company is not one of outright antagonism to labor unions. In some of its departments the employees were members of and represented by a Union. Its top officials did have, for reasons which do not clearly appear, an unfriendly attitude toward the International Typographical Union. The Typographical Union attempted to organize the composing room employees whereupon certain company officers became active in opposition thereto. Mr. Guthrie, the president, called a meeting of the composing room employees on January 24, 1952, at which meeting he said, among other things: "I am prohibited by law from telling you that I will never sign a contract with the Typographical Union." The Board

took this to mean that if he were free to speak he would state that he would under no circumstances sign a contract with the Union, and found that Guthrie's address, taken in conjunction with the remarks of Nickolay and Overton, employees holding supervisory positions, made known to the employees that the company would not bargain with the Union even if required to do so by law. The Board considered the revealing of this attitude to the employees an unfair labor practice.

Section 8(c) of the Act provides that, "The expressing of any views, argument, or opinion * * * shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit." Since we fail to find in Guthrie's statements implying that he would never deal with the Union, a "threat of reprisal or force or promise of benefit", we regard these statements as being within the protection of section 8(c). The same may be said of advice given by Guthrie to employees as to the manner in which union membership could be cancelled.

The Board's ruling that § 8(a)(1) had been violated was based in part on certain statements and inquiries made by mechanical superintendent Nickolay. One of these statements contained an explicit threat, towit: "* * * if the boys are taking out cards, they had better be careful of them, because if they do, they can look some place else for a job." The Board's finding of a violation of § 8(a) (1) is sustained insofar as it is based on this threat, since such a statement is not protected by § 8(c). However, other statements and inquiries attributed to Nickolay amount to no more than persuasion, and fall within the protection afforded by § 8(c).

On March 6, 1952, Thomas Mullins, a journeyman printer on respondent's newspaper and one of the fourteen employees who had made application for union membership, was discharged. He admitted having made a serious error the previous night in setting up a headline. He was informed that his discharge was because of that mistake and a mistake previously made. At the hearing the company attempted to show that Mullins had always been a poor workman and that the serious error immediately preceding his discharge was the culmination of a series of errors which could no longer be tolerated. There was evidence to the effect that on the whole Mullins' record was good; that mistakes of the kind Mullins made were not uncommon, and that no one else had ever been discharged because of an error of that character.

The persuasive evidence, insofar as the Board is concerned, were admissions said to have been made by night foreman Overton. It was on a shift over which Overton exercised supervision that the mistake was made. Overton was called into conference with mechanical superintendent Nickolay and production manager Davis the following morning. At the conclusion of the conference Overton approached Mullins and informed him that Nickolay wanted to see him. Mullins, upon meeting Nickolay, was informed by Nickolay that he was discharged because of the mistake he had made the previous night and, in addition, a mistake he had made on another occasion. Overton, however, informed Mullins that he was discharged because of his union activities. The Board credited this testimony of Overton who was in a position to know the reason for the discharge. We cannot say this testimony is not substantial and therefore, we may not disturb the finding based thereon, notwithstanding we probably would have reached a different conclusion had we been the triers of the facts.

On August 23, 1952, Joseph Bennett, one of the two employees who had spoken in favor of the Union at the January 24th meeting, was discharged. The reason given was an incident in which he had threatened the life of his foreman, Ward Arthurs. Bennett testified that he made the following statement in

response to a threat made by Arthurs to "fix" him: "Just a minute, Ward. Be careful. I served in the Army and I was overseas. I killed a couple of men in service of my country that hadn't done any hurt to me, but they were on the other side. Before you start to fix me, just be careful. Ward, I have always believed in the golden rule, do unto others as you would have others do unto you, and I have always lived the rules of live and let live—I have never harmed or done any damage to any man for personal gain or to get ahead myself." Bennett also testified that at the time production manager Davis discharged him, Davis would not permit him to give his full version of the incident. The trial examiner found the discharge arbitrary and concluded that it was motivated by an anti-union animus.

We cannot agree with the conclusion of the Board even though the credited testimony upon which it acted be given full weight. There must be some area in labor relations where an employer has the right to clear up a situation which not only threatens the orderly functioning of its business but could erupt into physical violence. We recognize that even though there may have existed adequate cause to discharge Bennett an unfair labor practice was committed if his discharge was actually based on union activities, but, we are convinced that the Board's conclusion that the discharge was motivated by an anti-union animus is not supported by the evidence. We are impressed with the fact that of the fourteen employees who joined the Union, Mullins and Bennett only were discharged. This in face of the conduct of one Edwin T. Thompson who, during the January 24, 1952 meeting, openly identified himself as being a spokesman for the Union. Thompson was not discharged but, on the contrary, was given assurance that "no one would be permitted to get rough with him or shove him around."

The Board's order is modified by striking all of sub. (b) of the cease and desist order except the following: "* * *

threatening its employees because of their activities on behalf of a labor organization;" by striking from subs. (a) and (b) of the affirmative action required to be taken by the company all reference to Joseph A. Bennett, and as so modified the order is

Affirmed.