CHAUFFEURS, TEAMSTERS AND HELPERS "GENERAL" LOCAL NO. 200, AFL, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, AFL, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 11601.

United States Court of Appeals Seventh Circuit.

May 14, 1956.

Saul Cooper, Milwaukee, Wis., David Leo Uelmen, Milwaukee, Wis., Padway, Goldberg & Previant, Milwaukee, Wis., of counsel for petitioner.

Victor M. Harding, Milwaukee, Wis., Whyte, Hirschboeck & Minahan, Milwaukee, Wis., Roger C. Minahan, Milwaukee, Wis., of counsel, for P & V-Atlas Industrial Center, Inc., Intervenor.

David P. Findling, Associate General Counsel, Norton Come, Attorney, N. L. R. B., Washington, D. C., Theophil C. Kammholz, General Counsel, Marcel Mallet-Prevost, Assistant General Counsel, Fannie M. Boyls, Rosanna A. Blake, Attorneys, National Labor Relations Board, for respondent.

Before FINNEGAN, SWAIM and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

By its petition, the union[1] described in the title asks us to review and set aside an order of the National Labor Relations Board,[2] dismissing a complaint issued against Atlas Storage Divsion, P & V Atlas Industrial Center, Inc., hereinafter referred to as "Atlas". The complaint was issued by the general counsel of the Board, upon charges filed by the Union, and alleged that Atlas had unlawfully refused, upon request, to bargain with the Union, had discriminatorily refused to reinstate an employee who struck in protest against the refusal to bargain, and had restrained and coerced its employees in the rights guaranteed them under the act, in violation of § 8(a) (1), (3) and (5) thereof.[3] A trial examiner found against Atlas, and the Board in general reversed the conclusions of the examiner that Atlas' conduct violated the act. As to one violation relating to one employee (Rodig), the Board, because of what it described as the isolated nature of said violation, held that it served no useful purpose to issue a cease and desist order based thereon. The Board dismissed the complaint.

For several years an association of warehouse companies of Milwaukee, including Atlas, bargained and entered into a series of contracts with the Union as bargaining representative of their *inland* warehouse employees. At least during the latter years of said period, the Association appointed negotiators to bargain with the Union but any agreement reached did not become binding on any employer member unless and until it signed it. The last of these contracts to which Atlas was a party expired on April 15, 1952.

On April 18, 1952, an Atlas employee filed a decertification petition with the Board alleging that a substantial number of employees no longer desired the Union to represent them and seeking a determination by the Board that the Union was no longer their bargaining representative. Atlas wrote the Union that in view of the decertification petition and a strong doubt whether a majority of employees wanted the Union to be their bargaining agent, Atlas did not think it proper to recognize the Union as bargaining agent until an election was held. Atlas also withdrew its authority from the Association's negotiators to bargain on its behalf. Atlas had no contract with the Union after April 15, 1952, although the Association did reach an agreement with the Union on July 30, 1952, providing for a wage increase.

On August 6, 1952, Atlas filed an application with the Wage Stabilization Board for permission to grant an increase to its employees equal to that

---

1. Referred to herein as "the Union".

2. The Board's decision will be found in 112 N.L.R.B. No. 144.

3. 29 U.S.C.A. § 158(a) (1), (3) and (5).

provided in the contract negotiated by the Association.

On October 9, 1952, the Board dismissed the decertification petition. It did so on the ground that the unit proposed in the petition—i. e. one limited to Atlas' employees, was inappropriate. The Board pointed out that Atlas had not withdrawn from membership in the Association and had not indicated an intent to abandon its practice of bargaining jointly with other employer members through the Association for its *waterfront* employees.

On October 14, 1952, the Stabilization Board refused to approve Atlas' application unless the Union joined in signing it. The Union did so and the application was approved.

The Union's business agent, Lemke, proposed that Atlas sign the same contract entered into between the Union and the Association. President Vogel of Atlas, however, handed Lemke a contract prepared by Atlas and suggested that the Union agree to it. This proposed contract provided for recognition of the Union as the exclusive representative of Atlas' *inland* warehouse employees and differed in substance from that negotiated by the Association only in that it did not contain the same vacation clause. Lemke agreed to take Atlas' proposal to the Union to find out if it could be approved. Atlas heard nothing further from the Union with respect to the proposed contract.

At Atlas' 1952 Christmas party Vogel announced that Atlas was considering the inauguration of a profit-sharing pension plan for the benefit of all its employees. Because the plan would require Stabilization Board approval, Atlas asked for the signatures of the officials of Local 815, representing its waterfront employees, and the Union herein, representing its inland employees. The former signed but the Union business agent said that, since the Union's contract with the Association would expire in a few months and negotiations toward a new one would begin shortly at which the Union expected to propose a health and welfare plan, the Union was not interested in discussing a separate plan on behalf of Atlas' employees alone.

On January 19, 1953, Atlas withdrew from the Association and it was dissolved. The Board found that, as a result thereof, Atlas' inland warehouse employees alone constituted an appropriate bargaining unit.

On January 21, the Union sent Atlas and other former members of the Association a form letter stating in part:

> "This is to advise you that we desire to negotiate changes in our labor agreement. This notice is given in compliance with the contract * * *. We shall be pleased to meet with you at your convenience. Hoping to hear from you * * *"

The Union sent a follow-up letter and requested a meeting. Not receiving a reply, the Union made no attempt to contact Atlas until May 25.

The Stabilization Board went out of existence and, on February 6, 1953, Atlas put into effect retroactively to December 31, 1952, its profit-sharing pension plan.

By April 15, 1953, when the last multi-employer contract expired, the Union and the various warehouse companies who were parties to it had been unable to reach an agreement on the terms of new contracts, and it became apparent that the Union might call a strike. President Vogel called a meeting of its five inland warehouse employees which was held on April 18, 1953. During the course of this meeting, he reminded the men that Atlas had not had a contract with the Union for over a year and then went on to discuss the profit-sharing pension plan adopted in February. At one point during the meeting, one of the employees said, "We want to know how to get out of the Union". In reply, Vogel told them that they could abandon the Union by writing Atlas a letter expressing their desire to do so. When employee Rodig indicated that the Union would hear about Vogel's statements, and that representative Lemke would call on Vogel, the

latter assured Rodig that it would do no good for Lemke to come because Atlas would have nothing to do with the Union.

On April 20, 1953, Atlas received a letter signed by four of the five employees in the unit, advising Atlas that they wished to withdraw from the Union and were terminating its right to represent them. The letter was prepared and circulated by employee Busch and no Atlas official played any part in drafting, typing or circulating it. Two of the employees had paid no union dues since February and neither they nor the others who signed the letter paid any union dues after signing.

On May 8, 1953, most of the other former members of the Association and the Union reached agreement on a new contract providing for a wage increase. On May 9, Vogel held another meeting with the inland warehouse employees at which he again remarked that Atlas had no contract with the Union, adding that, in fact, "there was no more union in the place". He then offered the men a wage increase equal to that which the other former Association members had agreed to pay.

On May 25, 1953, business agent Lemke called president Vogel and requested that they meet and negotiate a contract, pointing out that the other companies had executed a contract with the Union. Vogel refused to bargain with the Union at that time because, as he told Lemke, he believed that it no longer represented a majority of Atlas' employees. Lemke assured Vogel that the Union did represent the employees but Vogel reiterated his position and confirmed his refusal to bargain in a letter to the Union that same day. A copy of the letter was posted on the employee bulletin board at the warehouse.

Rodig was the only inland warehouse employee who did not sign the April 20 letter repudiating the Union. About May 11, 1953, during the period when it appeared probable that the Union might call a strike, president Vogel approached Rodig to say that if he went on strike he would "be through for good".

On May 27, Rodig, upon instructions from the Union, went on strike and picketed the warehouse. The other employees continued to work and no one was hired to replace Rodig, the remaining men taking over the work he had been performing. As a result of the strike, Atlas' business declined in volume due to the fact that some of its customers transferred their accounts permanently to other companies.

On July 3, pursuant to a complaint filed by Atlas, the Wisconsin Employment Relations Board found that the picketing was violative of state law and ordered the Union, and its agents and members, to cease picketing. Rodig, however, continued to picket until Friday, July 24, when he ceased as a result of an order of a state court predicated upon the previous state board order. On the first working day thereafter, July 27, Rodig made an unconditional application to president Vogel for reinstatement. Vogel advised Rodig that he, Vogel, would have to take the matter up with Atlas' board of directors and would let him know their decision. Later that day, Vogel wrote Rodig that:

"The company's position * * * is that you voluntarily left the employment of the company on May 27; that you failed to report for work through July 24. We have, therefore, concluded that you did not wish to be employed by this Company. Our first indication of your desire to work here was this morning. We believe we have sufficient personnel to perform the necessary warehouse work, and consequently find no opening for you."

On July 30, one of the warehouse employees was seriously injured and, as a result, Atlas, on August 7, advertised in the leading local newspapers for a warehouseman. Atlas did not notify Rodig of the vacancy. Rodig, on the other hand, saw the advertisement but did not apply for employment. A replacement

for the injured employee was hired on or after August 7.

The Board held that the speech given by the president of Atlas to the assembled employees on April 18, 1953, contained no illegal threats or promise of benefit and did not coerce, intimidate or threaten the employees in their rights guaranteed by the act, but was simply an expression of his opinions and was privileged under § 8(c) of the act. The Board also absolved Atlas of any wrongdoing in the part played by Vogel in having the employees withdraw from the Union.

The Board reversed the finding of unlawful conduct, based upon the "unilateral" adoption of the profit-sharing plan, on the ground that Atlas had withdrawn from the Association on January 19 and, insofar as the Union failed to specify that it represented a single employer unit in its requests to bargain after January 19, its requests to bargain were defective. Accordingly, the Board held that Atlas had no obligation to bargain and was free to deal directly with its employees.

The Board absolved Atlas of any wrongdoing when Vogel informed the assembled employees that he would not have anything to do with the Union on the ground that the Union had not submitted evidence of their majority status in, nor requested recognition for, the appropriate unit, and he was therefore under no duty to bargain. Being free of any obligation to deal with the Union, Atlas was also free to tell the employees that it would not do so.

The Board held that Atlas was under no duty to bargain at all after it received the letter signed by the employees in which they allegedly repudiated the Union, and, since the Board held that the employees were not illegally induced to repudiate the Union, it reversed the finding that Atlas violated § 8(a) (1) of the act on May 9 and § 8(a) (5) on May 25, 1953.

The Board sustained the finding of the trial examiner that Atlas did violate the act by threatening to discharge Rodig if he went on strike, but held that this violation was so "isolated" as not to warrant any remedial relief. The Board reversed the trial examiner's finding that Atlas violated § 8(a) (3) of the act by refusing to reinstate Rodig after he went on strike. The Board held that Rodig was not an unfair labor practice striker because Atlas was under no duty to bargain. Since he was an economic striker and his job was, for economic reasons, either abolished or absorbed by other employees, he was not entitled to reinstatement on July 27, 1953. The Board also held that Atlas was not under any duty to recall Rodig three days after the request for reinstatement, when another employee was injured and unable to work, because Atlas' duty did not require seeking him out, but merely not to discriminate should Rodig request new employment.

 **1.** The Union contends that, in view of all the evidence, Atlas unlawfully refused to bargain with the Union.

The finding of the Board that Atlas did not unlawfully refuse to bargain with the Union is supported by evidence in the record, and the reasonable inferences to be drawn therefrom. N. L. R. B. v. Columbian Enameling & Stamping Co., 306 U.S. 292, 297, 59 S.Ct. 501, 83 L.Ed. 660.

 **2.** The Union contends that Atlas interfered with, restrained and coerced its employees in violation of § 8(a) (1) of the act. It relies largely on what transpired at the meetings of April 18 and May 9, 1953. It urges that Atlas' entire course of conduct, as well as the speech to the "captive audience" on April 18, when considered together, was a continuous round of interference by the employer, and, when the "totality of activities" rule is applied, constitutes a violation of § 8(a) (1) of the act. It adds that the May 9, 1953 "unilateral" offer of a wage increase also interfered with and coerced the employees.

We hold that, on the record considered as a whole, the Board did not improperly find that Atlas' conduct, on the occa-

sions referred to, did not constitute violations of § 8(a) (1) of the act. N. L. R. B. v. D. Gottlieb & Co., 7 Cir., 208 F.2d 682, 684; N. L. R. B. v. Sun Co. of San Bernardino, 9 Cir., 215 F.2d 379, 381.

3. The Union further maintains that Atlas illegally discriminated in refusing to reinstate Rodig.

The Board found that Rodig struck on May 27, 1953, over Atlas' refusal to bargain on May 25. On July 27, he applied for immediate reinstatement. Atlas refused, however, to take Rodig back on the ground, *inter alia*, that it had sufficient personnel to handle its inland warehouse operations and, thus, that there was no opening for him. In support of this position, Vogel testified without contradiction that Atlas had lost business and, in consequence, Rodig's work had been absorbed by the other employees. The trial examiner, nevertheless, found that, as Rodig struck over the May 25 refusal to bargain, he was an unfair labor practice striker entitled under the circumstances to reinstatement. As we have found that Atlas was legally justified in refusing to bargain on May 25, Rodig was an economic striker. Consequently, as his job was for economic reasons either abolished or absorbed by other employees, he was not entitled to reinstatement on July 27. Upon these facts, we find that Atlas did not violate the act in refusing to reinstate him.

The examiner also concluded that Rodig, even if an economic striker only, was entitled to reinstatement when, three days after the application for reinstatement, an employee was injured and could no longer work. Atlas advertised for and hired a new employee. Rodig was not notified of the job, but he saw the advertisement. Nevertheless, he did not apply.

The Board did not agree that Atlas was under any duty to recall Rodig on July 30—the date of the employee's injury—or any time thereafter. As Rodig's employment was properly terminated when he applied for reinstatement, Atlas' duty toward Rodig did not require seeking him out but merely refraining from discriminating against him should he request new employment. However, he never made any such request.

As to Rodig, we believe that the Board's conclusion is correct. N. L. R. B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 346, 58 S.Ct. 904, 82 L.Ed. 1381; N. L. R. B. v. Lightner Publishing Corp., 7 Cir., 128 F.2d 237, 241.

For the reasons above set forth, the petition, insofar as it seeks to set aside the order reviewed, is denied.