**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**v.**

**SOLO CUP COMPANY, Respondent.**

**No. 15524.**

United States Court of Appeals
Eighth Circuit.

Oct. 18, 1956.

Rehearing Denied Nov. 16, 1956.

Samuel M. Singer, Atty., N. L. R. B., Washington, D. C. (Theophil C. Kammholz, Gen. Counsel, David P. Findling, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Nancy M. Sherman, Atty., N. L. R. B., Washington, D. C., were with him on the brief)', for petitioner.

John J. Hasburgh, Kansas City, Mo. (Carl E. Enggas and Watson S. Marshall & Enggas, Kansas City, Mo., were with him on the brief), for respondent.

Before WOODROUGH, VOGEL and VAN OOSTERHOUT, Circuit Judges.

VOGEL, Circuit Judge.

The National Labor Relations Board has petitioned this court pursuant to Section 10(e) of the National Labor Relations Act, 61 Stat. 136, 29 U.S.C.A. § 151 et seq., for enforcement of an order issued against respondent on September 21, 1955, following the usual proceedings under Section 10 of the Act. The decision of the National Labor Relations Board is reported at 114 N.L.R.B. No. 31.

The Board found that respondent, in violation of Section 8(a) (3) and (1) of the Act, discharged one of its employees (Page) because it believed such employee to be active on behalf of the International Brotherhood of Pulp, Sulphite and Paper Mill Workers, A.F.L.; that in further violation of Section 8(a) (3) and (1) it suspended four other employees (Westmoreland, Bradley, Warden and Palmer) because they participated in a brief strike protesting the alleged unlawful discharge of Page; and that by these and other acts of interference, restraint and coercion through the conduct of Joseph Donahoe, whom the company had allegedly clothed with apparent authority of a supervisor, had violated Section 8 (a) (1). The complaint was dismissed as to certain other employees not here involved. The Board adopted the fact determinations of the Trial Examiner.

The Board's order of which enforcement is sought here, requires the company to cease and desist from the unfair labor practices found or from in any other manner interfering with, restraining or coercing its employees in the exercise of their organizational rights. It also affirmatively requires the reinstatement of employee Page and to make her and employees Westmoreland, Bradley, Warden and Palmer whole for any loss of pay they may have suffered by reason of the discrimination against them, and to post appropriate notices.

Respondent resists enforcement of the order generally on three grounds: (1) There is no substantial testimony to justify the conclusions of the Board that the Solo Cup Company discharged Mary Page because it believed she was engaged in union activities; (2) the Board erred in holding that the suspension of Westmoreland, Bradley, Palmer and Warden for a period of four days constituted a violation of Section 8(a) (3) and (1) of the Act; and (3) the Board erred in finding that respondent independently violated Section 8(a) (1) of the Act by reason of the course of conduct of Joseph Donahoe.

Under 29 U.S.C.A. § 160(e), "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." A Court of Appeals may not disturb the Board's findings based on substantial evidence, even though such court, had it been the trier of the facts, would have reached a different conclusion. N. L. R. B. v. Sun Co., 9 Cir., 1954, 215 F.2d 379; Foreman & Clark, Inc., v. N. L. R. B., 9 Cir., 1954, 215 F.2d 396, certiorari denied 348 U.S. 887, 75 S.Ct. 207, 99 L.Ed. 697; N. L. R. B. v. Denton, 5 Cir., 1954, 217 F.2d 567, certiorari denied 348 U.S. 981, 75 S.Ct. 572, 99 L.Ed. 764. In N. L. R. B. v. United Biscuit Co., 8 Cir., 1953, 208 F.2d 52, certiorari denied 347 U.S. 934, 74 S.Ct. 629, 98 L.Ed. 1085, this

court stated the rule, 208 F.2d at page 54:

"In this proceeding we are not called upon to weigh the evidence but only to examine it for the purpose of determining whether or not on the entire record the essential findings are sustained by substantial evidence and in performing this function we must view the evidence in a light most favorable to the prevailing party."

To the same effect see N. L. R. B. v. Wheeling Pipe Line, Inc., 8 Cir., 1956, 229 F.2d 391; N. L. R. B. v. United Broth. of Carpenters, A.F.L., 10 Cir., 1950, 184 F.2d 60, certiorari denied 341 U.S. 947, 71 S.Ct. 1011, 95 L.Ed. 1371; N. L. R. B. v. Gonzalez Padin Co., 1 Cir., 1947, 161 F.2d 353. The Supreme Court, in N. L. R. B. v. Waterman S. S. Corp., 1940, 309 U.S. 206, 226, 60 S.Ct. 493, 503, 84 L.Ed. 704, after discussion of the division of authority between the Board and the courts, placed the role of this court in proper perspective as follows:

"The Court of Appeals' failure to enforce the Board's order resulted from the substitution of its judgment on disputed facts for the Board's judgment,—and power to do that has been denied the courts by Congress. Whether the court would reach the same conclusion as the Board from the conflicting evidence is immaterial and the court's disagreement with the Board could not warrant the disregard of the statutory division of authority set up by Congress."

See also N. L. R. B. v. Link-Belt Co., 1940, 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368.[1]

█ As the above cases have repeatedly defined this court's function, we are only to determine, upon looking at the record as a whole, if the Board has made findings based on substantial evidence.

While the record includes additional evidence, the finding of the Board as to interference, restraint and coercion is concerned mainly with the activities of Joseph Donahoe, respondent's "personnel man". We have reviewed the testimony regarding the activities and statements of Donahoe, as well as the other testimony on this point. It would serve no good purpose to recite the evidence in detail here. Donahoe was not a supervisor or a ranking member of the company hierarchy but he did exercise some control over employees and was certainly in a strategic position to translate to the employees the policies of the company. His activities and his statements to the effect that respondent would replace all employees on the evening shift and stop paying Christmas bonuses if the union organized the plant, and that one of the employees could retain her job only if she refrained from supporting the union, his warning employees that they would be discharged if they again engaged in a protesting strike like that involved in the discharge of employee Page, his threatening reprisals, coercive conduct and interrogating employees regarding union activities were unquestionably violative of Section 8(a) (1) of the Act, provided, of course, respondent was responsible for such activities. Respondent contends that it did not violate the Act on the ground that it was not responsible for the conduct or statements of Donahoe. The Board specifically found that:

"In view of Donahoe's various duties and undertakings shown in the record, it is clear that he was, or was held out as, a management rep-

1. In N. L. R. B. v. Waterman S. S. Co., supra, and N. L. R. B. v. Link-Belt Co., supra, the Supreme Court was dealing with the original National Labor Relations Act, since amended by the Act under consideration. The quoted statement would seem to carry equal weight when viewed against the amended Act. N. L. R. B. v. Denver Bldg. & Const. Trades Council, 1951, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284. The language of Section 10(e) of the amended Act is also essentially the same as in the original Act. See Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456, for a discussion of why the wording was changed.

resentative having specific functions bearing upon the Respondent's personnel and labor relations with the employees. He was referred to by Respondent at the representation hearing as 'the personnel man,' and was excluded from the bargaining unit. Donahoe described his job to individuals employed at the plant as that of 'personnel director' and 'personnel manager,' and he testified that his duties were 'to sort of feel out the pulse of the individuals working,' adding—'just personnel pulse.' "

The Board further found:

"Whether or not Donahoe was technically a 'supervisor' within the Act's definition, we conclude with the Trial Examiner that he had at least apparent authority to speak for management, and that the Respondent was responsible for his coercive conduct."

■ True enough, the record includes disclaimers of responsibility for the statements of Donahoe, but such disclaimers did not overcome the permissible conclusion that Donahoe was acting for respondent when he was continuously allowed to interview the employees, make threatening statements to them, and attend meetings. The situation presented was not unlike that where the right hand claims not to know nor be responsible for what the left hand does. We believe there was justification in the record for the Board's statement that:

"Nor was the Respondent relieved of such responsibility because of any instruction it issued to management personnel to remain neutral concerning union matters, as these instructions, in any event, were not communicated to the employees."

We accordingly conclude that there is substantial evidence on the record considered as a whole which supports the Board's finding that respondent violated Section 8(a) (1) of the Act. Cf. International Assoc. of Machinists, etc., v. N. L. R. B., 1940, 311 U.S. 72, 80, 61 S. Ct. 83, 85 L.Ed. 50.

With reference to employee Page, the Board found that she was discharged because the respondent believed that she was actively involved in union organizational activities. At her previous place of employment she had been a member of the United Garment Workers, A.F.L., from which she had received a booklet outlining the advantages and benefits of unionization. She brought this booklet to the plant and let several of her fellow employees read it. During her interview with Donahoe, he asked her what she thought of the union. When she told him that she had been a union member at another plant, he reminded her that the factory was a non-union establishment and stated that if the union should prevail in a coming election, the company had enough applications on file to replace all the girls on her shift. One of the four cup machines whose output employee Page was required to inspect produced defective cups. Some of these cups were passed unnoticed into cases and placed in the warehouse. After being asked why she had passed cups that were faulty, employee Page explained that the mistake had arisen because she had a lot of mechanical difficulty with the machines from which the cups had been produced. She was told to return to work. On the following day she was discharged.

■ Respondent insists that employee Page was discharged for failure to prevent faulty cups being cased and placed in the warehouse and that there is no substantial evidence to justify the finding of the Board that she was discharged for union activities. This presents the most difficult question in the case. Employee Page apparently was not one of the outstanding workers for unionization (she lived approximately 40 miles from the plant and had to commute—hence attended no union meetings) but there appears little question but what the respondent, through Donahoe's investigations, was aware of her activities. Donahoe's remarks to Page indicated his thinking as to her organizational activities. In addition, the reason given by

the manager for Page's discharge was one that apparently had been overlooked on numerous occasions as to other employees and, as pointed out by the Examiner, neither one of two other employees who failed to detect the faulty cups suffered any penalty for their mistakes. It was difficult for the Board to believe that Page, who had had an excellent work record, was discharged for any motive other than union activity. Her single lapse of inefficiency provided a mere excuse for company action against her. A justifiable ground for dismissal is no defense if it is a pretext and not the moving cause. N. L. R. B. v. Skinner & Kennedy Stationery Co., 8 Cir., 1940, 113 F.2d 667; N. L. R. B. v. Wells, Inc., 9 Cir., 1947, 162 F.2d 457.

We feel, therefore, that the finding of the Board with respect to the discharge of employee Page is supported by substantial evidence on the record as a whole and that accordingly the finding of the Board may not be disturbed by this court.

Subsequent to the discharge of employee Page, the four cup inspectors involved, Westmoreland, Bradley, Palmer and Warden, shut down their machines and with the other girls on the shift demanded they be allowed to talk with the plant manager as to why Page and another employee had been discharged. The foreman advised them that the manager had gone to his home but the cup inspectors insisted that they would wait his return (the evidence indicates that the manager was available on a 24-hour basis when needed). The foreman made telephone calls to the manager, who asked him to advise the employees that he would return to the factory later, talk to them in any way they wanted, and that in the meantime they should return to their jobs. The employees then went back to work. Shortly thereafter "personnel man" Donahoe arrived and requested an explanation of the circumstances. Upon being informed, he told cup inspector Palmer, "You go back and tell the girls if there is any more commotion like this shutting off the ma-

chines they might just as well time out and go home because they'll be fired."

The manager subsequently interviewed some of the complaining employees and while advising them that the company felt under no obligation to report to its employees on the matter, that Page and another employee had been discharged because they had failed to prevent faulty cups from being made. The employees insisted that the mistakes were "trifling" and that worse mistakes had been tolerated in the past. The meeting ended by the manager telling Westmoreland and Bradley, who represented the other employees, that nothing they might say or do would bring Page and the other discharged employee back to work; that they could so report to the other girls; that the girls could continue to work only "if they want to accept the situation as it now stands".

Donahoe, who had been present during the interview, told one of the employees, Westmoreland, that he did not believe she would like working for the company any more and that he, "just didn't think that working conditions were going to be favorable for (her)". At the start of the next afternoon shift, the manager called cup inspectors Bradley, Warden, Palmer and Westmoreland into his office and in the presence of Donahoe told them that they were being terminated "until further notice".

When asked why just four were being singled out for such a penalty despite the fact that the entire shift had stopped work, the manager told them that they were the only ones who had shut off their machines. The cup inspectors were laid off for a period of four days, after which they were called back to work. The Board found that the employees' concerted work stoppage for the purpose of obtaining an explanation for the discharge of Page and another employee and to argue against them was an activity protected by Section 7 of the Act and that the layoff of the four employees for participation therein violated Section 8(a) (3) and (1) of the Act. Respondent insists that the conduct

of the four employees under the circumstances was unreasonable, unlawful and arbitrary and not for the purpose of accomplishing a legitimate and recognized labor objective. Further, it contends that there is no evidence in the record that any employee demanded reinstatement of the two discharged employees or that the work stoppage was in protest of their discharge. We agree with the Board that the record indicates to the contrary. Inquiries with reference to the reason for the discharge of Page and another employee and protests when told by the management of management's alleged reasons for their discharge were made and indicate the employees' concern as to the discharge and their fear as to what might happen to them under similar circumstances.

Respondent cites N. L. R. B. v. Condenser Corp. of America, 3 Cir., 1942, 128 F.2d 67, 77, for the proposition that employees cannot insist that their demands be met in the middle of a working day. The fact situation therein was different from that which confronted the Board in the instant case. There the employers promised to deal with the employees in a group at the end of the day and the court found that:

"No promises had been broken; there was nothing to indicate that this particular promise would not have been kept."

In the instant case, as soon as definite promises had been made by the manager to return to the factory and talk with the girls in any manner they desired, they all returned to work.

We think a fair interpretation of the actions of the four employees in question brings their activities within the protective meaning of Section 7 of the Act. The Board found, and we think that substantial evidence in the

record sustains such finding, that the respondent violated Section 8(a) (3) and (1) of the Act by laying off the four employees because they concertedly protested against the discharge of a fellow employee. This court said, in Carter Carburetor Corp. v. N. L. R. B., 8 Cir., 1944, 140 F.2d 714, 718:

"Section 7 gives employees the right 'to engage in concerted activities, or for the purpose of collective bargaining or other mutual aid or protection.' This 'mutual aid' and 'concerted activities' include, we think, the right to join other workers in quitting work in protest over the treatment of a coemployee, or supporting him in any other grievance connected with his work or his employer's conduct. N. L. R. B. v. Peter Cailler Kohler Swiss Chocolates Co., 2 Cir., 130 F.2d 503; Firth Carpet Co. v. N. L. R. B., 2 Cir., 129 F.2d 633; N. L. R. B. v. Good Coal Co., 6 Cir., 110 F.2d 501; Rapid Roller Co. v. N. L. R. B., 7 Cir., 126 F.2d 452; N. L. R. B. v. Remington Rand, Inc., 2 Cir., 130 F.2d 919."

See also N. L. R. B. v. J. I. Case Co., 8 Cir., 1952, 198 F.2d 919, certiorari denied 345 U.S. 917, 73 S.Ct. 729, 97 L.Ed. 1351.

The employees might well have exercised better judgment by sending a committee to the management at a more convenient time for making their protest and demand, but we are unable to conclude that ill judgment or lack of consideration add up to illegality.[2] Regardless of what we think about the activities of the employees and the manner and time of making their protest and demand, we must conclude with the Board that their protest came within the protective purview of the Act.

An enforcement order will be granted.

2. N. L. R. B. v. Mackay Radio & Telegraph Co., 1937, 304 U.S. 333, 344, 58 S.Ct. 904, 82 L.Ed. 1381; Firth Carpet Co. v. N. L. R. B., 2 Cir., 1942, 129 F.2d 633, 636; Cusano v. N. L. R. B., 3 Cir., 1951, 190 F.2d 898, 902; N. L. R. B. v. McCatron, 9 Cir., 1954, 216 F.2d 212, 215, certiorari denied 348 U.S. 943, 75 S.Ct. 365, 99 L.Ed. 738; N. L. R. B. v. Globe Wireless, 9 Cir., 1951, 193 F.2d 748, 749–750.