UNITED STEELWORKERS OF AMERICA, AFL–CIO, and Local 4203, United Steelworkers of America, AFL–CIO, Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 15771.

United States Court of Appeals District of Columbia Circuit.

Argued March 2, 1961.

Decided May 4, 1961.

Petition for Reconsideration Denied Aug. 10, 1961.

Mr. David E. Feller, Washington, D. C., with whom Mr. Jerry D. Anker, Washington, D. C., was on the brief, for petitioners.

Mr. Melvin Pollack, Atty., N. L. R. B., with whom Mr. Stuart Rothman, Gen. Counsel, N. L. R. B., Mr. Dominick L. Manoli, Associate Gen. Counsel, N. L. R. B., and Mr. Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., were on the brief, for respondent.

Messrs. Louis Sherman, Laurence J. Cohen, Martin F. O'Donoghue, and Thomas X. Dunn, Washington, D. C., filed a brief on behalf of Building and Construction Trades Department, AFL-CIO, as amicus curiae, urging enforcement of the order of the National Labor Relations Board.

Before Mr. Justice REED, retired,[*] and PRETTYMAN and BAZELON, Circuit Judges.

PRETTYMAN, Circuit Judge.

This case is before us on a petition to review an order of the National Labor Relations Board and a cross-petition by the Board for enforcement of that order. The principal question presented is whether certain actions by the local union petitioner violated Section 8(b) (4) (A) of the National Labor Relations Act,[1] the so-called "secondary boycott" provision.

The Tennessee Coal and Iron Division of the United States Steel Corporation (hereinafter referred to as the "Company") operates an ore conditioning and sintering [2] plant near Bessemer, Alabama. The United Steelworkers of America is the certified bargaining representative of the production and maintenance employees at this plant, and the local union to which these employees belong is Local 4203 of the Steelworkers. We will refer to the International and Local collectively as the "Union".

In 1958 the Company announced its plans to construct a multi-million dollar addition to its facilities at the sintering plant, on the same tract but distant some 800 feet by air or half a mile by road. It informed the Union that the project would be a "lock and key" job, that is, performed entirely by independent contractors. Two prime contracts were let, one relating to the relocation of an office building on the proposed construction site and one for the construction work itself.

Before any work began on the project the Union took the position that under the bargaining agreement the Company was obligated to give preference in the assignment of the new work to qualified members of the bargaining unit who were then on lay-off.[3] On January 28, 1959, two days after work had begun, the Union repeated this demand, making specific reference to certain electrical work being done by a subcontractor. When the Company refused, several Union members went to the construction site and told the employees of the electrical subcontractor that they would have to leave the job because the work belonged to Steelworkers. The electricians left the job to check with their own union and then returned to work.

[*] Sitting by designation pursuant to 28 U.S.C. § 294(a).

1. 61 Stat. 141 (1947) (amended Sept. 14, 1959, 73 Stat. 542, 29 U.S.C.A. § 158(b) (4)).

2. "Sintering" is a step in the processing of mine-run ore for use in blast furnaces.

3. The collective agreement contained no express provision relating to the Company's right to "contract out" work. The Union's claim to preference rights was based upon the following facts: The agreement established job classifications for such trade or craft jobs as electrician, carpenter, painter, and bulldozer operator, to be performed in construction, maintenance and repair work; many of these jobs were permanently established in the Company's construction department; the agreement further provided that the Company was to give preference to employees on lay-off before hiring new employees.

The following morning the Company employees working in the sintering plant left their jobs, and a large number of them proceeded to the construction site in automobiles and on foot. There they told employees of the subcontractors to leave the job. Work on the construction project then ceased. Work in the sintering plant began again with the arrival of the afternoon shift. A similar incident occurred on February 3rd, after some of the construction employees had resumed work on the project.

Following the January 29th incident Union members were stationed along the access road to the Company premises at a point where pickets had traditionally been placed. Employees of the contractors who were on their way to the construction project were requested to turn back. At no time did the pickets attempt to induce Steelworkers, i. e., those working for the Company in the sintering plant, not to work, and the only work stoppage in the plant itself after January 29th occurred during the morning shift on February 3rd, as mentioned above. Picketing continued until February 19th, when the Company and the Union met to discuss the dispute; and work on the construction project was resumed a week later, when the Company agreed to assign some of the project work to its own employees, as it was permitted to do under one of the prime contracts.

The Trial Examiner held that the Union had not violated Section 8(b) (4) (A), because the object of the picketing was to force the Company to assign part of the construction work to Steelworkers and the effect upon the subcontractors was merely secondary. The Board reversed the Examiner and held that an immediate direct object was to force the contractors to cease doing business with the Company.

The basic facts material to the problem, drawn from the foregoing statement, are as follows: The Union is the certified bargaining agent of the production and maintenance employees of the Company. A dispute arose between the Union and the Company. The Company had let to two general contractors contracts for the construction of new facilities. The general contractors subcontracted parts of the construction work. Some members of the Union were in lay-off status. The Union claimed that under its agreement its members on lay-off status were entitled to be employed on some parts of the construction work. The construction site was on the same tract as the existing plant but some distance away and separated by a railway cut. The one access road ran through a town a mile away, and the Union Hall was located on that road. In prior disputes the Union had located picket lines at that point.

When the present dispute became acute, some members of the Union twice went by auto to the construction site and told the employees of the subcontractors the work was rightfully theirs, i. e., the callers', and asked these employees to stop work. Work was thus stopped twice temporarily and then indefinitely. The Union established a picket line at the usual place on the road. Employees of the contractors and the subcontractors were asked to honor this line. They did so, and the construction work was shut down. Employees of the Company were passed through the line, and work at the plant was not interrupted.

From the foregoing basic facts the Board inferred as an ultimate fact that an object of the Union's successful inducement of the employees of the subcontractors to stop work was to force the subcontractors and the contractors to cease doing business with the Company. It further found as a fact that this object was the primary object of the Union's course of action and was direct and foreseeable and designed to disrupt the operations of the subcontractors.

The Board reasoned in the following fashion: The picketing at both the construction site and on the access road was not directed at Company employees but solely at the employees of the subcontractors. The cessation of the construction work was a foreseeable objective, rather than an incidental effect, of such

action. The distance from the plant to the construction site by road was half a mile. At the time of the appeals to the employees at the construction site, only employees of the subcontractors were there. No explanation was offered as to why, the sole dispute being with the Company, it was necessary for the Union to picket at a geographically separated site where no Company employees were, or were expected to be in the foreseeable future, at work. It was not necessary for the Union, in order to advertise their dispute with the Company, to picket thus or to appeal thus to the subcontractors' employees. Picketing of the Company, with which the Union had its sole dispute, could have been carried on effectively without embroiling the contractors or the subcontractors or their employees. Thus the Board reasoned.

■ The Board concluded that the course of action of the Union was an unfair labor practice within the prohibition of Section 8(b) (4) (A) of the Act. We agree. We are of opinion that the inferences of fact drawn by the Board from the basic facts were reasonable and rational inferences. And we are of further opinion that the conclusions of the Board were rational and reasonable conclusions from those facts. Since we are of these opinions, our function is at an end.

■ It is axiomatic by now that, if the words "an object" in the statute were read literally, unions would be deprived of their power to exert pressure in labor disputes to a far greater extent than Congress intended; and thus cases involving this section of the Act frequently require a balancing of the economic interests of various employers, especially so-called secondary employers, and unions. As we have pointed out before this,[4] when a union engages in coercive activity it generally hopes, even if it does not intend, to affect the business relations between the primary and "neutral" employers. Congress did not intend to proscribe all actions accompanied merely by such hopes. "[A]n object" in the statute means something more than a hope or expectation.

■ The Board's decisions are frequently phrased in conclusory terms, such as "primary" and "immediate" objectives and "direct" and "foreseeable" effects. These words must be understood as expressing ultimate findings of fact, inferences drawn from evidence in the record. This is the step in the decisional process that immediately precedes the drawing of conclusions of law. But these terms must not be allowed to crystallize into doctrinaire labels to be used to squeeze problems into fixed slots. They are adjectives of inference from basic facts as those facts appear in a record. The real legal significance of these ultimate findings or inferences and the consequent conclusions lies in the basic facts from which they spring. This is the test we apply in the case before us. Thus tested, we think, as we have indicated, the conclusions are reasonable upon the record. The final conclusion represents a reasonable accommodation of the interests of the Union, the contractors, the subcontractors, and the Company.

The Union argues, principally, that the alleged unfair labor practice arose out of a legitimate dispute with the Company involving job rights of Union members; that it is not an unfair labor practice to induce employees of other employers not to enter the premises of the primary employer; that the common situs cases are inapplicable here; that picketing at the site of a primary dispute is not an unfair labor practice; that, since the contractors were doing the very work which was in dispute, the Union's effort to protect its claim to that work was not illegal. The doctrines thus advanced have support in cases which are cited. But for one of these doctrines to be applicable in a given case the facts in that case must furnish the basis for the application. In the case at bar the basic

---

4. Seafarers International Union, Etc. v. N. L. R. B., 105 U.S.App.D.C. 211, 265 F.2d 585 (1959).

facts are clear and simple and the conclusions of fact and of law flow from them directly and simply. There is no room here for doctrines which are useful in the solution of difficult questions posed by other facts not so clear and uncomplicated.

We comment upon only the last of the above-mentioned contentions of the Union. The argument is that the contractors were not neutrals but were doing the very work which was the subject of the primary dispute. It is contended that the object of the shut-down of the construction project was to preserve the work which was in dispute. The argument must be evaluated and disposed of upon the facts as they are in this case, not upon a hypothetical or theoretical basis. The parties agree that the answer depends upon a balancing of the interests of the Company employees and of the contractors in the work. This balancing must be done in the light of the facts of the Union's course of action. This was not "struck work". The contractors were independent contractors; the parties appear to agree they were not "allies" of the Company. The contractors could not resolve the dispute. The Union members claimed a right under their bargaining agreement; the claim was debatable, but it posed a bona fide dispute. The Union members did not want to work for the contractors; they wanted the work as Company employees. The purpose of the shut-down of the construction work was plainly to force the Company to assign this work to these Union members. Nevertheless the efforts at work-stoppage were directed solely against the contractors. We think the interest which the employees had, as shown by this record, did not justify the action they took, as shown by this record. We think the action here taken, in the light of these facts, was clearly within Section 8(b) (4) (A).

5. See Communications Workers of America A.F.L.-C.I.O. v. N. L. R. B., 362 U.S. 479, 480–481, 80 S.Ct. 838, 4 L.Ed.2d 896 (1960); Highway Truck Drivers

 The Union argues that the Board's cease and desist order is too broad and must be modified. The order directs the Union to cease and desist from "inducing, or encouraging the employees of [the contractors or subcontractors], *or of any other employer,* except the employees of [the Company]," etc., "where an object thereof is to force or require the said employers *or any other employer or person,*" etc. (Emphasis added.) We think the order should be modified, as requested, to correspond to the violations actually found to have been committed.[5]

The Board's order will be affirmed as modified. An enforcement decree of the modified order will issue.

So ordered.

& Helpers Local 107, etc. v. N. L. R. B., 107 U.S.App.D.C. 1, 273 F.2d 815 (D.C. Cir. 1959).