300 F.2d 649
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF the PLUMBING AND PIPE FITTING INDUSTRY OF the UNITED STATES AND CANADA, LOCAL NO. 469, AFL-CIO; United Brotherhood of Carpenters and Joiners of America, Local No. 1100, AFL-CIO; and International Hod Carriers', Building and Common Laborers' Union of America, Local No. 556, AFL-CIO, Respondents.
 No. 17451.
 United States Court of Appeals Ninth Circuit.
 March 9, 1962.
 
 Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Asso. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles, William J. Avrutis, Attorneys, NLRB., Washington, D. C., for petitioner.
 Minnie & Sorenson, A. D. Ward, Phoenix, Ariz., for respondent.
 Before JERTBERG, BROWNING and DUNIWAY, Circuit Judges.
 JERTBERG, Circuit Judge.
 
 
 1
 This case is before this Court upon petition of the National Labor Relations Board, pursuant to Section 10(c) of the National Labor Relations Act, as amended (61 Stat. 136, as amended by 72 Stat. 945, 29 U.S.C.A. § 151 et seq.), charging the respondents with unfair labor practice.
 
 
 2
 The cease and desist order, which the Board seeks us to enforce, in relevant part reads as follows:
 
 
 3
 "1. Cease and desist from engaging in, or inducing or encouraging the employees of W. D. Don Thomas Construction Company or any other employer to engage in, a strike or concerted refusal in the course of their employment to use, manufacture, process, transport or otherwise handle or work on any goods, articles, materials or commodities, or to perform any services, where an object thereof is to force W. D. Thomas Construction Company or any other employer or person to cease doing business with Howard C. Johnson."
 
 
 4
 Pursuant to Section 10(e) of the Act, this Court has jurisdiction as the unfair labor practice occurred at Winslow, Arizona.
 
 
 5
 The Board found that respondent Unions induced and encouraged employees of William D. Thomas, a general contractor, to engage in a strike with an object of forcing Thomas to cease doing business with Howard C. Johnson, his plumbing subcontractor, and thereby violated Sec. 8(b) (4) (A).[1]
 
 
 6
 The Unions resist the enforcement of the Order on two grounds: First, that the decision of the Board is not supported by substantial evidence; and, second, that the Amended Order of the Board is too broad in scope.
 
 
 7
 We will first consider the Unions' contention that the decision of the Board is not supported by substantial evidence. On or about September 8, 1959, Thomas, as general contractor, began constructing a building for Mountain States Telephone Company at Winslow, Arizona. On October 8th, in connection with this work, he signed a labor agreement with the Phoenix Building Trades Council covering members of the respondent Laborers' Union and respondent Carpenters' Union, and also members of the Locals Cement Makers' and Teamsters' Unions. We will hereafter refer to the respondents as the "Plumbers' Union," "Carpenters' Union," and "Laborers' Union." Thomas subcontracted the plumbing work on the project to Howard C. Johnson who was nonunion. Beginning with the second week of construction operations, business agents of the Unions in varying combinations visited the job site on several occasions. On one of the earlier visits in September, the agent of the Plumbers' Union asked Thomas' job superintendent, Tacke, for the name of the plumbing subcontractor. Tacke replied that he did not have that information. When the inquiry was repeated a week later, Tacke informed the business agent of the Plumbers' Union that the plumbing contract had been sublet to Johnson. According to Tacke, the business agent of the Plumbers' Union replied, "Well, that won't do. He is nonunion; we can't have him on the job." According to Tacke, substantially the same statements were repeated on later visits to the job site.
 
 
 8
 On October 12th and 13th, Johnson's plumbers did some preliminary work on the job while carpenters and laborers were also working. On October 15th, the business agents of the Unions visited the job site. There were no plumbers on the job on this occasion but the business agents observed that some plumbing work had been done. One of the business agents asked Tacke who had done the work, and Tacke replied, "Johnson." It appears that on this same visit to the job site, the business agents of the Unions discussed with Tacke the status of the employment of one Parker, a nonunion night watchman, at the job site. Tacke stated that Parker was not hired through the union. The Unions' business agents inquired of Tacke as to Parker's rate of pay and one of the business agents stated that Parker was being paid below the union scale. At some point during the October 15th conversation, one of the business agents stated, "Well, I'm going to have to pull our boys off." Following the conversation, the business agents of the Carpenters' Union and the Laborers' Union instructed the members of the Unions who were then working on the job site not to return to work the following day. On the following day, which was a Friday, the employees who were members of the Carpenters' and Laborers' Unions did not show up for work. On Monday, October 19th, the Unions' members returned to work. On the same morning, Johnson's master plumber and two helpers came to the job site. Although they were told by Tacke not to work lest the carpenters walk off the job, it appears that the employees of Johnson did some work on that day. On the same day, the business agents of the Carpenters' and Laborers' Unions met with Thomas concerning the failure of Thomas to pay union scale to Parker, the night watchman. As a result of such meeting, the pay rate of Parker was later increased to the union scale. On October 26th, Johnson's plumbers returned to the job site and continued thereafter without interruption to work while the members of the Unions were likewise on the job.
 
 
 9
 The findings of fact of the Trial Examiner were adopted by the Board. From such findings the Trial Examiner concluded that an object of the work stoppage on October 16th was to cause Thomas to cease doing business with his nonunion subcontractor, Johnson, and that the Unions' action in causing the said work stoppage was violative of Sec. 8(b) (4) (A) of the Act.
 
 
 10
 The conclusions of the Trial Examiner were likewise adopted by the Board.
 
 
 11
 The Unions do not contend that their members did not engage in a strike. Their main contention is that the strike was primary in nature and that the sole object thereof was to remedy the alleged violation by Thomas of his bargaining agreement in respect to the hiring of Parker.
 
 
 12
 We have carefully reviewed all of the evidence in this case, and find it is sufficient to support the decision of the Board that an object of the strike was to cause Thomas to cease doing business with Johnson. Such conduct is forbidden by Section 8(b) (4) (A) of the Act. National Labor Relations Board v. Laundry, Linen Supply & Dry Cleaning Drivers Local No. 928, etc., 262 F.2d 617 (9th Cir., 1958), "it is not necessary to find that the sole object of the strike was that of forcing the contractor to terminate the subcontractor's contract. This is emphasized in the legislative history of the section." (Emphasis in original opinion.) National Labor Relations Board v. Denver Building & Construction Trades Council, et al., 341 U.S. 675, 689, 71 S.Ct. 943, 952, 95 L.Ed 1284. It is enough that it is an object. Retail Fruit & Vegetable Clerks Union, Local 1017 et al. v. National Labor Relations Board, 249 F.2d 591 (9th Cir., 1957). We will now consider the breadth of the order.
 
 The Trial Examiner found:
 
 13
 "On all the evidence I find that an object of the work-stoppage which occurred on October 16th was to cause Thomas to cease doing business with Johnson, and that the Respondents' action in causing the said work-stoppage was therefore violative of Section 8(b) (4) (A) of the Act."
 
 
 14
 As a conclusion of law, the Trial Examiner stated:
 
 
 15
 "By inducing and encouraging employees of Thomas to engage in a strike with an object of forcing Thomas to cease doing business with Johnson, his plumbing subcontractor, the Respondents jointly and severally have engaged in unfair labor practices within the meaning of Section 8(b) (4) (A) of the Act."
 
 
 16
 Without finding of fact or conclusion of law relating to any employer except Thomas, the Trial Examiner recommended to the Board the adoption of a cease and desist order in the form set forth at the beginning of this option. The Board adopted the findings and conclusions of the Trial Examiner but adopted a modified order which eliminated the words "or any other employer" and the words "or any other employer or person," appearing in the recommended form of order, thereby limiting the order to Thomas. It was the view of the Board that the opinion of the Supreme Court in Communications Workers of America, AFL-CIO et al. v. National Labor Relations Board, 362 U.S. 479, 80 S.Ct. 838, 4 L.Ed.2d 896 (1960), indicated that the recommended form of order was too broad. Thereafter a motion for reconsideration was made to the Board by its General Counsel. Upon reconsideration, the Board came to the conclusion that said Supreme Court decision was not controlling in the instant case because the violation there was of Section 8(b) (1) (A) of the Act involving pressure or coercion upon employees, and not, as in the instant case, pressure upon neutral employers in violation of Section 8(b) (4) (A) of the Act, and that earlier decisions of the Supreme Court[2] authorized the broad order in the form recommended by the Trial Examiner. The Board then adopted the order appearing earlier in this opinion.
 
 
 17
 The Board has called to our attention no specific evidence received at the hearing to support an inference that the Unions held a fixed determination to put Johnson out of business so long as he remains nonunion. Johnson ceased to be a union contractor in 1957. Since that time, he has subcontracted without trouble on numerous jobs where union members worked. In the instant case, Johnson's plumbers did some preliminary work on October 12th and 13th while carpenters and laborers were also working. The same was true on October 19th. The actual strike occurred only on one day when Johnson's men were not working. On October 26th, Johnson's plumbers returned to the job site and continued thereafter, without interruption, to work while members of the Union were likewise on the job. In support of the broad order, the Board argues:
 
 
 18
 "* * * if a union resorts to secondary pressure against one employer in furtherance of a particular primary dispute, it is a fair inference that it will engage in similar conduct against other secondary employers, so long as the underlying dispute remains unresolved. For, in such a situation, the union is not concerned with who the secondary employer is, but with reaching anyone who happens to do business with the primary employer — as a means of exerting pressure on that employer to grant the union's ultimate demands. It should be noted that the Board in this case did not issue an order protecting any other primary employer, but merely enjoined the Unions from involving any other secondary employers in their dispute with Johnson, the particular primary employer here. * * *."
 
 
 19
 In support of this argument, the Board relies upon International Brotherhood of Electrical Workers et al. v. National Labor Relations Board, supra, footnote 2. In that case, one Giorgi was the prime contractor on the project. He did part of the work with his own employees, who were Union members, but subcontracted the electrical work to one Langer, and the carpentry work to one Deltorto whose employees were likewise Union members. Langer, in the past, had employed Union men but, prior to this project, had become involved in a dispute with the electrical workers' Union because of his employment of nonunion men. A representative of the electrical workers' Union visited the project where Deltorto and his two carpenters were working and informed Deltorto and his workmen that the electrical work on the job was being done by nonunion men. Later the representative picketed the premises himself, carrying a placard that the job was unfair to the electricians' Union. Deltorto and his men thereupon stopped work and left the project. Deltorto telephoned Giorgi that his carpenters had walked off because of the presence of the picket. The Union representative also telephoned Giorgi stating that he would have to replace Langer with a Union contractor in order to complete the job. Giorgi recited the circumstances to Langer and the latter released Giorgi from the electrical subcontract, saying he would step aside so that a Union subcontractor could take over. Langer did no further work on the project. Under such facts, the Supreme Court ordered the enforcement of a cease and desist order in the same form as the order here under attack. The fact that Langer was involved in a dispute with the electrical workers' Union at the time he received the subcontract from Giorgi, the fact that his subcontract amounted to only $325.00 and the fact that he was pressured into releasing the prime contractor from his obligations under the subcontract before the subcontract was completed, support an inference that the Union would engage in similar tactics against other employers engaging the services of Langer. We do not believe that the decision of the Supreme Court can properly be construed to hold that in every violation of Section 8(b) (4) (A), regardless of the evidence, the broad cease and desist order should issue. As stated in Communications Workers of America, AFL-CIO et al. v. National Labor Relations Board, supra, 362 U.S. at p. 480, 80 S.Ct. at p. 840:
 
 
 20
 "* * * `It would seem * * clear that the authority conferred on the Board to restrain the practice which it has found * * * to have [been] committed is not an authority to restrain generally all other unlawful practices which it has neither found to have been pursued nor persuasively to be related to the proven unlawful conduct.' [National] Labor [Relations] Board v. Express Pub. Co., 1941, 312 U.S. 426, 433 [61 S.Ct. 693, 698, 85 L.Ed. 930]. See also May [Dept.] Stores Co. v. [National] Labor [Relations] Board, 1945, 326 U.S. 376 [66 S.Ct. 203, 90 L.Ed. 145]. * * *".
 
 
 21
 In National Labor Relations Board v. International Longshoremen's and Warehousemen's Union, Local 10 et al., 283 F. 2d 558 (9th Cir., 1960), this Court stated, at p. 568:
 
 
 22
 "The Board cannot restrain practices which it has neither found to have been pursued nor to be related to proven unlawful conduct. Communications Workers of America, A. F. of L.-C. I. O. v. N. L. R. B., 1960, 362 U.S. 479, 80 S.Ct. 838, 4 L.Ed.2d 896. See also Morrison-Knudson Co. v. N. L. R. B., 9 Cir., 1960, 276 F.2d 63, 76. A broad order will be modified unless the evidence supports a proclivity for unlawful action or unless a finding relating to the likelihood of similar violations is made either by the Board or the Trial Examiner. See N. L. R. B. v. Local 476, United Ass'n of Journeymen, etc., Plumbers, 1 Cir., 1960, 280 F.2d 441. * * *."
 
 
 23
 The broad order places the Union in a dilemma in respect to employers against whom they have a legitimate grievance if Johnson happens to be a subcontractor on a project even though such grievance may be totally unconnected with the presence of Johnson on the project.
 
 
 24
 As we read the Board's opinion, it approached the problem of determining the proper scope of its order as if that question were to be resolved simply by classifying the pending case in one or another of the available statutory categories. The earlier Supreme Court decisions were read as permitting a broad order in Section 8(b) (4) (A) cases, and the latter decision as permitting only a narrow order in 8(b) (1) (A) cases. Since this was an 8(b) (4) (A) case, the Board approved the broad form of order.
 
 
 25
 The Board's decision must evidence a reasoned determination, based upon appropriate legal criteria and properly supported findings of fact, that the form of order adopted is reasonably necessary, in the legal and factual circumstances of the particular case, to prevent recurrence of the activity found to be unlawful.
 
 
 26
 We recognize the deference due to the expertise of the Board, but we also think that both the Board and the courts have a duty to see that the Board's orders are so framed as to promote, rather than defeat, the primary purpose of the Labor-Management Relations Act, as laid down in Section 1 (29 U.S.C.A. § 151).
 
 
 27
 We think it appropriate to afford the Board a choice, either (1) that an order be entered striking from the Board's order the words, "or any other employer" and the words "or any other employer or person" and enforcing the order as so modified, or (2) that the matter be remanded to the Board for such further proceedings, including the taking of additional evidence before the Examiner, as may be deemed appropriate in the light of this opinion. (See National Labor Relations Board v. International Longshoremen's & Warehousemen's Union, 283 F.2d 558 (9th Cir., 1960); cf. United Steelworkers of America, AFL-CIO et al. v. National Labor Relations Board, 294 F.2d 256 (D.C.Cir., 1961).)
 
 
 28
 If within thirty days, the Board shall file with this Court a statement that it prefers the second alternative, the matter will be remanded to the Board. If no such statement is filed, then the order will be modified and enforced. The exercise by the Board of the choice hereby afforded is not to be taken as a consent by it to the decision we have made, or a waiver of its right to seek further review if so advised.
 
 
 
 Notes:
 
 
 [1]
 
 "UNFAIR LABOR PRACTICES"
 * * * * *
 "Sec. 8(b) It shall be an unfair labor practice for a labor organization or its agents —
 * * * * *
 "(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike, or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; * *".
 
 
 [2]
 International Brotherhood of Electrical Workers et al. v. National Labor Relations Board, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951); Local 74, United Brotherhood of Carpenters & Joiners of America, A.F. of L. et al. v. National Labor Relations Board, 341 U.S. 707, 71 S. Ct. 966, 95 L.Ed. 1309 (1951)