**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ISIS PLUMBING & HEATING CO., Respondent.**

**No. 18364.**

United States Court of Appeals
Ninth Circuit.

Sept. 23, 1963.

Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles and Paula Omansky, Attys., N. L. R. B., Washington, D. C., for petitioner.

Hill, Farrer & Burrill, Carl M. Gould and Stanley E. Tobin, Los Angeles, Cal., for respondent.

Before HAMLEY, JERTBERG and DUNIWAY, Circuit Judges.

JERTBERG, Circuit Judge.

This case is before the court on the petition of the National Labor Relations Board (hereinafter the "Board") for enforcement of its order issued against respondent on September 19, 1962, in Case No. 21–CA–4579, pursuant to Section 10 (c) of the National Labor Relations Act, as amended, (29 U.S.C. §§ 151 et seq.). The Board's decision and order are reported at 138 NLRB No. 97. This Court has jurisdiction of the proceedings under Section 10(e) of the Act.

The Board found, upon charges filed by Local No. 582, United Association, affiliated with United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL–CIO (hereinafter the "Union"), that respondent discharged and refused to reinstate Mark G. Harrigan because he preferred charges with the Union against a fellow Union member for violating provisions of the Union's constitution. The Board concluded that Harrigan's discharge was discriminatory in respect to hire and tenure of Harrigan's employment, contrary to Section 8(a) (3) of the Act, and constituted unlawful interference, restraint and coercion in the exercise of rights guaranteed him by Section 7 of the Act, in violation of Section 8(a) (1) of the Act.

In its order, the Board adopted the findings, conclusions and recommendations of the Trial Examiner contained in his Intermediate Report and Recommended Order which was issued April 11, 1962, after a hearing on February 19, 1962. The Board ordered respondent, *inter alia:*

(1) to cease and desist from violation of the Act in the particulars mentioned above;

(2) to offer Mark G. Harrigan reinstatement to his former or equivalent position; and

(3) to pay Mark G. Harrigan a sum of money equal to the amount which he normally would have earned as wages in respondent's employ between the date of his discharge and the date of any proper reinstatement offer (less net earnings during this period) together with interest at the rate of six percent per annum.

The issues raised in respondent's answer to the Board's petition are whether the evidence is sufficient to support the Board's finding that respondent terminated Harrigan's employment because he threatened to file and did file charges against two fellow workers; and, if the evidence is sufficient to support the finding, whether the order requiring interest on the back pay award is beyond the Board's statutory authority.

In order to place in proper focus respondent's contention that the finding of fact of the Board, that respondent terminated the employment of Mark G. Harrigan because he filed and threatened to file charges with the Union against two Union members who were employed as foremen by respondent, is not supported by substantial evidence on the record considered as a whole, it is necessary to summarize the testimony in the record.

The General Counsel's case in chief consists of the testimony of Harrigan and one Ray North, the business manager

of the Union. Harrigan's testimony may be summarized as follows: That he had been a plumber for 41 years and a member of the Local Union for 21 years; that he was dispatched by the Local Union on October 30, 1961 to respondent's Gussen construction project where he was hired as a journeyman plumber by one Bernard Dean, who was respondent's foreman on the project; that he worked 8 hours on October 30th, on October 31st and November 1st; that his employment was terminated around noon on November 2nd by Dean who delivered respondent's check to Harrigan, which included 8 hours pay for November 2nd; that Dean stated to him that his work was satisfactory and that the termination of his employment was "an order from the shop"; that Dean stated "that they never wanted me on the job, and he would call the business manager and explain to him why;" that on October 31st, while working on respondent's project, he noticed Mr. Dean using his pickup truck and later noticed Mr. Kellogg using his station wagon during working hours; he spoke with each of them about the matter and stated his objections but did not indicate to either one that he would file charges; and on the next day he noticed Kellogg using his station wagon on two occasions, and told him, in the presence of Dean, of his intention to file charges with the Union that night; that at the direction of Mr. North he had an interview with Mrs. Ray, secretary-treasurer of respondent, at whose office he arrived at approximately quarter to twelve a. m., on November 3rd; that the interview lasted from five to ten minutes in the presence of Mrs. Ray's secretary; that during the interview Mrs. Ray called him a troublemaker and said she didn't want him on the job, that he was causing trouble and doing nothing but preferring charges against people; and that there was also some discussion concerning the renting by respondent of trucks belonging to their employees.

The record reveals that on November 14th Harrigan filed charges with the Union against Dean.

Mr. North's testimony may be summarized as follows: Mr. North testified he was business manager of the Local Union; that he had known Harrigan as a member of the Local for a number of years; that Harrigan had been an active member of the Local and had served on the Apprenticeship Committee composed of Union members and employer members; that the Union office dispatched Harrigan as a journeyman plumber to respondent's project on October 30, 1961; that on the evening of November 1, 1961, Harrigan filed a charge with the Union against one Ben Kellogg, a foreman of respondent on the Nabisco project, for using his own car on the company business in violation of the Union's constitution and the collective bargaining agreement between respondent and the Union; that on the morning of November 3rd, Mr. Dean phoned him and inquired about Harrigan's charge against Kellogg; that he told Dean that Harrigan had the right to file the charge, to which statement Dean agreed; that in the same conversation Dean also stated that Harrigan's work had been satisfactory, and that he didn't know why Harrigan's employment was terminated; that on the morning of November 3rd he phoned to Mrs. Ray and inquired as to the reason for Harrigan's discharge; that Mrs. Ray stated Harrigan was a troublemaker and had been on jobs before and had caused some trouble; that he explained to Mrs. Ray that Union members were forbidden to use their own cars on the employer's business; that he arranged an interview between Harrigan and Mrs. Ray for around 1:20 or 1:30 p. m. that day; that Harrigan was agreeable to the arrangements that had been made for the interview; that he was acquainted with members of the management of respondent; that they were not anti-union, and that the Union had had no prior difficulty with them.

The respondent's case may be summarized as follows:

In the fall of 1961, respondent was engaged as plumbing contractor on a construction project known as the Gussen project which was located on East Ball.

Road in Anaheim, California. Mr. Bernard Dean served as respondent's foreman on this project. At the same time respondent was engaged as plumbing contractor for a construction project near the Gussen project known as the "Nabisco" project. Mr. Ben Kellogg served as respondent's foreman on this project. In 1959 and in early 1961, respondent engaged as plumbing contractor on other projects which will be hereafter discussed. The witnesses for respondent were Bernard Dean, Ben Kellogg, above mentioned; Kenneth Westover, managing officer and president of respondent; Mary J. Ray, secretary-treasurer of respondent; Werner Wenedt, a journeyman plumber employed by respondent on the Gussen project; and Joe Andrews, a journeyman plumber and foreman employed by respondent on the Pacific-Hawaiian and the Autonetics projects, hereinafter mentioned.

Mr. Dean's testimony may be summarized as follows:

That he was a member of the Local Union; that he was employed by respondent as a foreman on the Gussen project, pursuant to an October 27th, 1961, request of the superintendent of the project's general contractor that the second floor "top-off" stage of the plumbing installation be speeded to completion, Dean called the Union office for the dispatch of three additional journeymen plumbers; on the morning of the next work day, Monday, October 30th, three men were dispatched to the site and were hired by Dean as journeymen plumbers; that Mark G. Harrigan was one of those hired; that while Dean was acquainted with Harrigan, the two of them had never worked together; that about noon of the same day, Mr. Westover, superintendent of respondent came to the job, and informed Dean that the hiring of Harrigan "didn't set too well with the company from previous work"; and instructed Dean that if there was any drinking, or if Harrigan tried to take over the job or cause any trouble, to let him know; that on October 31st, Harrigan informed Dean that it was against the Union rules

for Dean to use his car in respondent's business; that after further discussion on the subject Harrigan told Dean "Well, use it till the end of the week, and then from then on don't use it any more."; that on the following morning Harrigan complained to Dean that Kellogg was using his car in respondent's business;

That on October 31st, Dean instructed Harrigan and Mr. Wenedt to work together; that the work they were assigned to do "kind of dragged"; that Wenedt complained to Dean that afternoon that he was unable to work with Harrigan and would resign if he were not transferred to another location;

On November 1st the "top-off" work on the Gussen project was nearing completion, which fact was reported by Dean to respondent's office on that day; Dean was informed by respondent's office secretary, Mrs. Dowd, to discuss with Ben Kellogg the prospective transfer of some of the journeymen plumbers to the Nabisco project from the Gussen project; that Dean was instructed to lay off any men who were not required by Kellogg at the Nabisco project whenever their work on the Gussen project was completed; Dean received no instruction as to whether Harrigan was to be transferred to the Nabisco project or retained on the Gussen project; on November 1st, Dean and Kellogg consulted about the transfer of men and it developed Kellogg required only three journeymen working under Dean; on the morning of November 2nd Dean reported by telephone to respondent's office that Harrigan had been selected to remain at the Gussen project; that on November 2nd, the "top-off" work on the Gussen project was completed in the early afternoon and the other journeymen were then transferred to the Nabisco project;

That the finishing of the "top-off" work meant that respondent's plumbing work on the project would undergo a temporary delay to permit further progress in the construction of the building; that at the appropriate time plumbing work would resume in the form of "finish" work; that upon completion of the "top-

off" work on the Gussen project, Dean gave Harrigan his final paycheck which Dean had just received from respondent's office, which check included payment for the entire November 2nd working day; that Dean advised Harrigan that respondent's work on the project would have to be suspended and that he was being laid off for lack of work;

That Dean and Kellogg chose the journeymen to be transferred to the Nabisco project on the basis of "their ability and their work and their getting along with the men," with the objective of getting men "who would work well together"; and that there were no employees of respondent's on the Gussen project for ten days or two weeks after November 2nd.

Mr. Kellogg's testimony may be summarized as follows:

That he was a member of the Local Union; that on November 1st, 1961 because of an emergency which arose on the Nabisco job which required Dean's attention, he was for a short time substitute foreman for Dean on the Gussen project; that during said period he directed Harrigan to perform certain work in a certain manner; that Harrigan disobeyed his orders and informed the apprentice who was assisting that Kellogg didn't know what he was talking about; that Harrigan said nothing to him at any time about the use of his car on respondent's business, or stated to him that he intended to file charges with the Union; and that he was directed by the Union to pay a fine of $50.00 for violating the Union's constitution, which fine he had appealed.

Mr. Wenedt's testimony may be summarized as follows:

That he was a member of Local 495 of the United Association; that he worked as a journeyman plumber for respondent on October 31, 1961, on the Gussen project; that he was teamed with Mr. Harrigan; that both workers received certain work instructions from Dean, that Harrigan "blew his top" over mistakes made by an apprentice, failed to follow Dean's work instructions, criticized Wenedt's working on a Union travelling card outside his Local's home jurisdiction; and that he reported to Dean that he couldn't work with Harrigan.

Mr. Westover's testimony may be summarized as follows:

That he was a member of Local No. 78, of the United Association; that he was managing officer and president of respondent; that Harrigan worked for respondent as a journeyman plumber for a few days in April, 1959, without incident; that he was rehired on June 24, 1959 as journeyman and shortly thereafter was made foreman on respondent's Pacific-Hawaiian job; that the plumbing work on the project was not progressing; that upon making inquiry of Harrigan as to the lack of progress, Harrigan replied: "What difference did it make? You are in here on the cost-plus, anyway"; that Harrigan absented himself from the project on several occasions without leave; that he drank on the job, and that he disobeyed orders; that it was necessary to engage one, Mr. Andrews, journeyman plumber as a co-foreman on the job to speed up the work on the project; that Harrigan was discharged in the fall of '59 for lack of work and drinking; and that Harrigan was rehired by respondent in December, 1960 or January, 1961.

Mr. Andrews' testimony may be summarized as follows:

That he was a member of Local 495 of the United Association; that in the fall of 1959 he was hired as a co-foreman on the Pacific-Hawaiian project; that Harrigan was also a foreman on the job; the job was "dragging"; that Harrigan was away from the project on several occasions during working hours; there was no discipline or coordination in the work;

That he was foreman for respondent on the Autonetics project in January of 1961; that he phoned the Local Union for additional men and was told Harrigan was at the top of the list; that he informed the business manager of the Local Union that he would take Harrigan if Harrigan understood there would be no drinking or harassment of any kind

on the job and would take orders and do his work; that he hired Harrigan as a journeyman plumber and put him to work in a section by himself; that Harrigan did "topping out" work upon which there was no rush; that Andrews had other journeymen working in groups, doing the same kind of work, where more speed was required to complete the work in the area; that Harrigan worked about three weeks and was laid off for lack of work.

Mrs. Ray's testimony may be summarized as follows:

That Harrigan arrived at her office for the interview at 12:45 p. m.; that her secretary was present at the office; that "When he [Harrigan] came through the front door, come in and hit both sides of the door and the girl, my secretary was standing in front of a little sink she had there and she dashed over and started to grab him. She thought he was going to fall"; that she told Harrigan she wanted to discuss with him complaints from other workmen which came to the office when Harrigan was on the job; that Harrigan stated that he had never had any trouble any place; that Harrigan informed her that he had not yet filed charges against Kellogg or Dean but that he was going to file a charge against Kellogg for using his car in the respondent's business; that Kellogg "wasn't even turned out as an apprentice, shouldn't be working as a foreman and he doubted if either he or Mr. Dean were working as foremen."; that she was unaware that Harrigan filed the charge against Kellogg; that she didn't refer to Harrigan as a troublemaker nor did she accuse him of always preferring charges against others.

On rebuttal, General Counsel offered the testimony of Floyd Aldrich. He testified that he was managing director of the Apprentice and Training Trust Fund for the Pipe Trades; that he knew Mr. Harrigan as a brother member of the United Association; that Mr. Harrigan visited his office in Los Angeles in the early part of November 1961; that it was around the noon hour; that Harri-

gan stated that he had just come from respondent's office; that he was thinking of filing some charges; that he was going to see an attorney across the street; that he and Harrigan visited about three-quarters of an hour; and in response to a question by General Counsel as to whether he noticed "any strange odors coming from Mr. Harrigan's mouth?", stated "If you are referring to Mr. Harrigan as being drinking or intoxicated, no, I did not."

Harrigan was not called by the General Counsel for the Board to testify as a rebuttal witness.

The material facts found by the Trial Examiner may be summarized as follows:

1. That on October the 27th, the Superintendent for the general contractor on the Gussen project requested of respondent that the second floor "top-off" stage of the plumbing installation be speeded to completion. Respondent on that day requested the Union's business office to dispatch to the project three additional journeymen plumbers. On October 30th the three plumbers, one of whom was Harrigan, were hired by Dean. On November 1st the "top-off" work was nearing completion, which fact Dean reported to respondent's office. On November the 1st, pursuant to directions of respondent, Dean and Kellogg discussed the prospective transfer of some of the journeymen plumbers from the Gussen project to the Nabisco project. Pursuant to their decision, the journeymen plumbers employed on the Gussen project, except Harrigan, were notified of their transfer to the Nabisco project effective the next day. Dean notified respondent's office that the "top-off" work would be completed the next day, and that no employees of respondent would be required on the Gussen project after such completion, for the immediate future. The "top-off" work was completed on November the 2nd. On that day Dean gave Harrigan his final paycheck and advised Harrigan that he was being laid off for lack of work. Dean stated to Harrigan that his work had been satisfactory, ex-

plaining that an "order from the shop" had led to Harrigan's discharge. Dean stated to Harrigan, respondent never wanted him on the job and that he would explain why to the Union office. For approximately ten to fourteen days none of the respondent's employees was required on the Gussen project.

2. On October 31st, Harrigan spoke to Dean about Dean's use of his pickup truck on respondent's business. On the same day Harrigan saw Kellogg using his own station wagon on company business on two different occasions. On November 1st, Harrigan again saw Kellogg using his station wagon on company business, and later told Kellogg that he would prefer charges against him with the Union that night. On the same night Harrigan did prefer charges against Kellogg. On November 3rd, Dean telephoned North at the Union office inquiring as to the charges filed by Harrigan against Kellogg. In the same conversation Dean disclaimed any knowledge as to the reason for Harrigan's dismissal.

3. Dean and Kellogg made the decision which resulted in Harrigan's retention on the Gussen project.

The record is clear that no more journeymen plumbers were required on the Nabisco project than were transferred to such project following the completion of the "top-off" work on the Gussen project.

From such distillation arises the question as to why Harrigan was not chosen by Dean and Kellogg for transfer to the Nabisco project instead of one of the three journeymen who were transferred. The Trial Examiner resolved the question by concluding that Dean and Kellogg's knowledge of Harrigan's expressed intention to file charges against them with the Union provided the principal, if not the sole motivation, for their decision to retain him on the Gussen project subject to completion of the "top-off" work.

While the Trial Examiner in his Intermediate Report and Recommended Order devotes much effort in characterizing the testimony of Mrs. Ray and Westover as "without significance," or "rationalized,"

or "contrived" or afterthought, his finding of fact that "Dean and Kellogg clearly made the decision which resulted in Harrigan's retention on the Gussen project," relieves us from the necessity of considering the basis of the animus, if any, entertained toward Harrigan by Mrs. Ray or Westover, since such animus, if any, played no part in the decision of Dean and Kellogg to retain Harrigan on the Gussen project. We need only be concerned with the motivations which prompted Dean and Kellogg to eliminate Harrigan from among the journeymen selected by them for transfer to the Nabisco project.

The Trial Examiner's conclusion that Dean and Kellogg's knowledge of Harrigan's expressed intention to file charges against them with the Union was the principal, if not the sole, motivation to retain Harrigan on the Gussen project subject to completion of the "top-off" work, is based upon inferences drawn by him from two circumstances. The first circumstance relates to the time when Dean delivered the paycheck to Harrigan. The Trial Examiner found, as facts, that at that time Dean advised Harrigan that respondent's work on the project had to be suspended and that he was being laid off for lack of work, and when Harrigan asked Dean whether his work was satisfactory, Dean replied affirmatively, explaining that "an order from the shop" led to his discharge, adding that "they" never wanted Harrigan on the job, saying that he would call the Union's business manager and explain why. The second circumstance relates to the telephone conversation on November the 3rd between North and Dean in which conversation Dean disclaimed any knowledge as to the reason for Harrigan's discharge.

From such circumstances the Trial Examiner drew the inference that no reason for their decision to retain Harrigan on the Gussen project existed except the unexpressed reason that Harrigan had filed charges with the Union against Kellogg and had threatened to file charges against Dean.

The reviewing power of this court over orders of the Board is set forth in Section 10(e) of the Act, 29 U.S.C. § 160(e). The standard of review set forth in that provision is elaborated upon in Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and its companion case, N. L. R. B. v. Pittsburgh S. S. Co., 340 U.S. 498, 71 S.Ct. 453, 95 L.Ed. 479 (1951).

The Act provides, in pertinent part, that "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." In Universal Camera, the Court reviewed the judicial climate and legislative history surrounding the adoption of the phrase "substantial evidence on the record considered as a whole." In the course of its opinion, the Court stated:

> "Whether or not it was ever permissible for courts to determine the substantiality of evidence supporting a Labor Board decision merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn, the new legislation definitely precludes such a theory of review and bars its practice. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement in both statutes that courts consider the whole record. Committee reports and the adoption in the Administrative Procedure Act of the minority views of the Attorney General's Committee demonstrate that to enjoin such a duty on the reviewing court was one of the important purposes of the movement which eventuated in that enactment." (340 U.S. pp. 487–488, 71 S.Ct. pp. 463–465, 95 L.Ed. 456).

\* \* \* \* \*

"Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." (340 U.S. p. 488, 71 S.Ct. pp. 464–465, 95 L.Ed. 456).

\* \* \* \* \* \*

"The legislative history of these Acts demonstrates a purpose to impose on courts a responsibility which has not always been recognized. Of course it is a statute and not a committee report which we are interpreting. But the fair interpretation of a statute is often 'the art of proliferating a purpose,' Brooklyn National Corp. v. Commissioner [2 Cir.], 157 F.2d 450, 451, revealed more by the demonstrable forces that produced it than by its precise phrasing. The adoption in these statutes of the judicially-constructed 'substantial evidence' test was a response to pressures for stricter and more uniform practice, not a reflection of approval of all existing practices. To find the change so elusive that it cannot be precisely defined does not mean it may be ignored. We should fail in our duty to effectuate the will of Congress if we denied recognition to expressed Congressional disapproval of the finality accorded to Labor Board findings by some decisions of this and lower courts, or even of the atmosphere which may have favored those decisions.

"We conclude, therefore, that the Administrative Procedure Act and the Taft-Hartley Act direct that courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within

reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." (340 U.S. pp. 489–490, 71 S.Ct. pp. 465–466, 95 L.Ed. 456).

■ Under the rationale expressed in Universal Camera, supra, it is our duty in determining the substantiality of evidence supporting a Labor Board decision, to take into account contradictory evidence or evidence from which conflicting inferences could be drawn.

"The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Universal Camera, supra, 340 U.S. p. 487, 71 S.Ct. pp. 463–464, 95 L.Ed. 456.

Our study of the record reveals matters which must be taken into account in appraising the substantiality of the evidence supporting the Labor Board decision. Harrigan's hire on the Gussen project by Dean arose out of the need of respondent for extra journeymen to quickly complete the "top-off" work on the Gussen project. We find nothing in the record surrounding the hire of the extra journeymen on October 30th which even suggests that their employment would extend beyond completion of the "top-off" work for which they were hired. This fact lends substance to Dean's statement to Harrigan, when the "top-off" work was completed, that he was being laid off for lack of work. The record also reveals that on noon of the day when Harrigan commenced his work, Superintendent Westover expressed to Dean dissatisfaction with Harrigan's presence on the project and made it clear that respondent didn't want Harrigan on its payroll. This fact lends substance to Dean's statement to Harrigan that respondent never wanted Harrigan on the job. Wenedt's testimony as to Harrigan's attitude and conduct when Wenedt and Harrigan were working together on October 31st is uncontradicted. Likewise uncontradicted is Dean's testimony that Wenedt threatened to resign if he had to work with Harrigan. The Trial Examiner, while recognizing that this incident might be said to have substance in respect to Harrigan's antagonism toward fellow workers, dismisses this incident as not being seriously regarded by Dean because Dean failed to mention such incident in his telephone conversation with North.

Also uncontradicted in the record is the testimony of Kellogg as to Harrigan's attitude and conduct on November 1st when Kellogg was serving as substitute foreman for Dean on the Gussen project. The Trial Examiner dismisses this incident by stating that "Nothing in the record, therefore, can be said to sustain a determination that the incident—though it may have taken place—preceded Kellogg's consultation with Dean regarding the future disposition of the Gussen crew." The record strongly suggests that this incident preceded the consultation between Kellogg and Dean. The only time that Kellogg served as a substitute foreman on the Gussen project during the period under review was early on the morning of November 1, while Dean was doing emergency work elsewhere. In our view it is more likely that the incident preceded the consultation between Dean and Kellogg than that it occurred after the consultation.

Thus, when Dean and Kellogg held their consultation as to which journeymen should be retained on the Gussen project and not transferred to the Nabisco project, they were aware, in addition to the fact that Harrigan had

threatened to file charges against them with the Union:

   (a)   that respondent was dissatisfied with the hiring of Harrigan and his presence on the job;

   (b)   that the three journeymen who were hired on October 30th were engaged to finish the "top-off" work on the Gussen project;

   (c)   that the journeyman assigned to work with Harrigan threatened to resign because of Harrigan's antagonistic attitude toward him and Harrigan's failure to follow the foreman's instructions; and

   (d)   that Harrigan disobeyed Kellogg's instructions when he was substitute foreman on the Gussen project, and belittled his capacity as a foreman.

Each of the above enumerated items furnishes a strong and convincing motivation for the discharge of Harrigan, and in totality reduces the motivation found to exist by the Trial Examiner to minor proportions and outweighs the inferences drawn by the Trial Examiner from the fact that Dean told both Harrigan and North that Harrigan's work on the Gussen project was satisfactory, and told North that he didn't know why Harrigan had been laid off. Such statements may reasonably be attributed to a desire on the part of Dean to avoid argument and a reluctance to criticize a very officious and active fellow member of the Local Union. Dean was under no obligation to explain to North the reasons for Harrigan's discharge, and his failure to mention the Wenedt incident to North does not remove the incident as a motivating factor in the discharge of Harrigan.

■ The entire record must be viewed in context with the established principle of law that an employer may discharge an employee for good cause, or bad cause, or no cause at all, unless the real motivating purpose is to do that which Sec. 8(a) (3) of the Act forbids. N. L. R. B. v. Sebastopol Apple Growers Union, 269 F.2d 705 (9th Cir., 1959); N. L. R. B. v. Latex Industries, Inc., 307 F.2d 737 (6th Cir., 1962). See also N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1936).

■ We should also mention the fact that the discharge of Harrigan was not discriminatory on its face, and that the motivation for his discharge rests entirely upon inferences to be drawn from the record. In view of such circumstance, and in light of the entire record, we believe that the respondent is entitled to have considered the attitude of the respondent toward the Union, which factor was not considered by the Board. Mr. North, whose testimony was credited by the Examiner, testified that the members of the management of respondent were not anti-union and that the Union had had no prior difficulty with them. As pointed out in N. L. R. B. v. Chronicle Publishing Co., 230 F.2d 543, 547 (7th Cir., 1956), a hostile, anti-union attitude on the part of an employer

> "has often been referred to as background, and in innumerable cases has been utilized for concluding that an act by an employer, otherwise innocent, is discriminatory. Conversely, we think that an employer with a friendly, sympathetic union attitude is entitled to credit in characterizing its acts which in themselves may not be discriminatory."

■ Mindful of the admonitions expressed in Universal Camera, supra, we cannot conscientiously find that the evidence supporting the decision of the Board is substantial when viewed in the light that the record in its entirety furnishes. The petition for enforcement must be dismissed and the order of the Board set aside.

In view of the conclusion which we have reached, we deem it unnecessary to discuss the question of the Board's authority to require payment of interest upon a back pay award.

Petition dismissed and the Order of the Board set aside.

DUNIWAY, Circuit Judge (dissenting).

I dissent. If this court were the original trier of fact, I might reach the same conclusion as my brethren. But we are not the original triers of fact, nor are we re-triers of fact. Universal Camera does not make us re-triers of fact. In Radio Officers' Union of Commercial Telegraphers Union, A. F. L. v. N. L. R. B., 1954, 347 U.S. 17, 50, 74 S.Ct. 323, 340–341, 98 L.Ed. 455, the Supreme Court said "that insofar as the power to draw reasonable inferences is concerned, Taft-Hartley did not alter prior law." It is the Board that draws inferences. It is also the rule that conflicts in the evidence are to be resolved by the Board, not by us.

In this case, as my brethren correctly state, the question is whether "the real motivating purpose is to do that which Sec. 8(a) (3) of the Act forbids." In other words, did the employer have an unlawful motive? It need hardly be said that in a contested matter we will almost never find any direct evidence coming from the party involved in support of a finding of such a motive. It must be inferred, and the inference can be drawn only after conflicting evidence is resolved. This is peculiarly a question for the trier of fact. This is such a case.

My brother Jertberg's opinion shows where the principal conflicts lie. Harrigan stated that Dean told him that his work was satisfactory and that the order for his termination came from the shop. Dean said, in substance, that Harrigan's work was not satisfactory and that Dean got no such order. Harrigan said that he complained to both Dean and Kellogg about their use of their cars on the job, and that he told Kellogg, in Dean's presence, that he was going to file charges with the union. Kellogg denies this, but Dean, in part, corroborates Harrigan. It was Kellogg who most strongly supported the claim that Harrigan's performance was unsatisfactory. Dean's similar testimony is partly hearsay. Harrigan said that Mrs. Ray called him a trouble-maker and said that she didn't want him on the job, and that he was doing nothing but preferring charges against people. Mrs. Ray denied this. North corroborates Harrigan, saying that Dean told North that Harrigan's work was satisfactory, and that Mrs. Ray told North that Harrigan was a trouble-maker. Mrs. Ray at least implied that Harrigan was drunk when he called upon her. This is contradicted by Aldrich. On the question of Harrigan's ability to perform satisfactorily, it appears that he had 41 years experience, and had on three other occasions been employed by this employer.

To decide the question presented, the trial examiner had to decide whom he would believe, and then to infer the ultimate fact—did the employer have the unlawful intent? I suggest that in such a case the examiner, as the trier of fact, had an incalculable advantage over us. He saw and heard the witnesses. He had a far better basis for determining these issues than we do. We ought to adhere to the usual rules as to the resolution of conflicts in testimony and the drawing of inferences that must rest in large part upon the fact finder's judgment as to the motives of persons whom he has seen and heard and we have not.

The trial examiner's findings cover eight pages of legal cap, single spaced. In them he carefully examines the testimony, specifically resolves the conflicts, and states his reasons. He did not resolve every conflict against the employer. Thus he found that Dean and Kellogg decided that Harrigan should be terminated. He also found that Dean told Harrigan that he had "orders from the shop." It would unduly extend this opinion to describe in detail the manner in which the trial examiner resolved the conflicts and drew the ultimate conclusions that "the knowledge of Dean and Kellogg with respect to Harrigan's proposed course of conduct [i. e. preferring charges against them with the Union] provided the principal, if not the sole

motivation for their decision" to terminate Harrigan. I am of the opinion that his decision, adopted by the Board, is "supported by substantial evidence on the record considered as a whole," and is therefore "conclusive" (29 U.S.C. § 160 (e)).

It has been said, and I think correctly, that the Taft-Hartley Act, as construed in Universal Camera, did not make the Board's findings as vulnerable before us as those of a trial judge (N. L. R. B. v. Smith Victory Corp., 2 Cir., 1951, 190 F.2d 56). But even if it did (cf. N. L. R. B. v. Grand Central Aircraft Co., 9 Cir., 1954, 216 F.2d 572, 573), I do not think that this is a proper case for us to reverse, because the decision rests primarily upon an appraisal of the veracity and the motives of those who appeared before the trial examiner.

The Supreme Court has, since Universal Camera, applied to Board cases the usual rule that the findings of the trial examiner, on matters involving credibility, are generally to be upheld. N. L. R. B. v. Walton Mfg. Co., 1962, 369 U.S. 404, 408, 82 S.Ct. 853, 7 L.Ed.2d 829. We have applied the same rule. (N. L. R. B. v. International Longshoremen's Union, 9 Cir., 1960, 283 F.2d 558). We have applied the rule, recognized as proper in Universal Camera (see 340 U.S. 488, 71 S.Ct. 464–465, 95 L.Ed. 456), that so long as there is substantial evidence in the record "we may not disturb the finding [of the board] * * * notwithstanding we probably would have reached a different conclusion had we been the triers of the facts." (N. L. R. B. v. Sun Co., 9 Cir., 1954, 215 F.2d 379, 381; see also N. L. R. B. v. Mrak Coal Co., 9 Cir., 1963, 322 F.2d 311; N. L. R. B. v. United Ass'n of Plumbing Indus., 9 Cir., 1962, 300 F.2d 649; N. L. R. B. v. International Longshoremen's Union, supra; N. L. R. B. v. Sebastopol Apple Growers Union, 9 Cir., 1959, 269 F.2d 705, 710). The good relations of the employer and the union is material evidence, but not controlling. (See N. L. R. B. v. Mrak Coal Co., supra; N. L. R. B. v.

Whitin Mach. Works, 1 Cir., 1953, 204 F.2d 883).

I think that my brethren push Universal Camera too far. I would enforce the order. However, because my brethren do not pass upon the question, I likewise refrain from expressing any view as to the Board's authority to require payment of interest upon a back pay award.